FILED-CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT  01 OCT 11 PM 4: 19
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

TX EASTERN-BEAUMONT

BY_____

|  |  |  |
|---|---|---|
| MARVIN LEE WILSON, | ) | |
| | ) | |
| **PETITIONER** | ) | |
| | ) | |
| | ) | |
| **VS.** | ) | CIVIL NO. <u>6:01CV186</u> |
| | ) | |
| | ) | |
| GARY JOHNSON, Director | ) | |
| Texas Department of | ) | |
| Criminal Justice, | ) | |
| Institutional Division, | ) | |
| | ) | |
| **RESPONDENT** | ) | |
| | ) | |

## <u>PETITION AND BRIEF FOR A WRIT OF HABEAS CORPUS</u>

## <u>THIS IS A CAPITAL CASE</u>

## <u>MR. WILSON IS NOT CURRENTLY SCHEDULED TO BE EXECUTED</u>

Respectfully submitted,
Law Office of James A. DeLee
2300 Memorial Blvd.
Port Arthur, Texas 77640
(409) 983-3234 office
(409) 983-5906 fax.

BY: JAMES A. DELEE
TBN: 05650500
**ATTORNEY FOR PETITIONER**

5

MARVIN LEE WILSON, Petitioner herein, respectfully requests that this Honorable Court issue a Writ of Habeas Corpus granting him relief from the judgment and conviction of capital murder and the sentence of death. Petitioner is currently confined on death row in the Texas Department of Criminal Justice, Institutional Division, Terrell Unit. Petitioner's execution date has not been set at the time of filing this petition.

# TABLE OF CONTENTS

Page

Introduction   …………………………………………………………………………... 1

Statement of Claims……………………………………………………………………….2

Statement of Jurisdiction………………………………………………………………….3

Prior Proceddings……………..…………………………………………………………….3

Statement of Facts………………………………………………………………………….5

Claim for Relief—I……………………………………………………………………… 9

Claim for Relief—II……………………………………………………………………...16

Claim for Relief—III……………………………………………………………………. 24

Claim for Relief—IV……………………………………………………………………. 32

Claim for Relief—V……………………………………………………………………. 38

Claim for Relief—VI……………………………………………………………………. 41

Prayer for Relief………………………………………………………………………… 42

Certificate of Service…………………………………………………………………… 43

### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | |
|---|---|
| **MARVIN LEE WILSON,** ) | |
| ) | |
| **PETITIONER** ) | |
| ) | |
| **VS.** ) | **CIVIL NO. 6:01CV186** |
| ) | |
| **GARY JOHNSON, Director** ) | |
| **Texas Department of** ) | |
| **Criminal Justice,** ) | |
| **Institutional Division,** ) | |
| ) | |
| **RESPONDENT** ) | |
| ) | |

## PETITION AND BRIEF FOR A WRIT OF HABEAS CORPUS

## THIS IS A CAPITAL CASE

## MR. WILSON IS NOT CURRENTLY SCHEDULED TO BE EXECUTED

MARVIN LEE WILSON, Petitioner herein, respectfully requests that this Honorable Court issue a Writ of Habeas Corpus on the grounds that he is being unlawfully incarcerated on death row in Texas by virtue of a judgment of conviction of capital murder and sentence of death entered in violation of the Constitution of the United States. In support, Mr. Wilson shows the following:

# STATEMENT OF CLAIMS

1. Petitioner's Rights under the 8th and 14th Amendments to the United States Constitution were violated by the state trial court's failure to inform the jury that Petitioner would not be Eligible For Parole until he served 35 Years.

2. Petitioner's Conviction was based on an Unconstitutionally Vague and Overbroad Statute in Violation of the 8th and 14th Amendments to the United States Constitution.

3. Petitioner's Rights Were Violated Under the 6th Amendment and the Equal Protection Clause of the 14 Amendment of the United States Constitution.

4. Petitioner's Due Process Rights Under the 4th Amendment to the United States Constitution were Violated by the Introduction of Evidence Seized Under Invalid Search Warrants.

5. Petitioner was Denied Effective Assistance of Counsel at Trial when the Conduct Fell Below an Objective Standard of Reasonableness in such a way as to Undermine Confidence in the Outcome of the Trial in Violation of the Sixth Amendment to the U.S. Constitution.

6. Petitioner was Denied Effective Assistance of Counsel on Appeal when the Conduct Fell Below an Objective Standard of Reasonableness in such a way as to Undermine Confidence in the Outcome of the Appeal in Violation of the Sixth Amendment to the U.S. Constitution.

## STATEMENT OF JURISDICTION

This Petition is brought pursuant to 28 U.S.C. §2254 and Rules Governing Section 2254 cases in the United States District Courts.

## PRIOR PROCEEDINGS

On December 18, 1992, Mr. Wilson was indicted for capital murder pursuant to Tex. Penal Code § 19.03(a)(2) for committing the murder of Jerry Williams during the course of kidnapping in cause no. 63490, in the 252nd Judicial District Court of Jefferson County, Texas. Mr. Wilson pled not guilty and the case was tried to a jury. On April 27, 1994, the jury found Mr. Wilson guilty of capital murder and on April 28, 1994, the jury answered the special issues in such a manner that the trial judge sentenced him to death. On direct appeal, the Texas Court of Criminal Appeals reversed and remanded the case for a new trial due to the prosecutor's improper jury argument. *(See Appendix Vol. 1, Exhibit #1, copy of the 1997 Texas Court of Criminal Appeals' Opinion)*

On January 26, 1998, the retrial commenced. On February 26, 1998, the jury returned its verdict finding Mr. Wilson guilty of capital murder. The sentencing phase ended on February 28, 1998, with the jury answering the special issues such that the trial court imposed the ultimate sentence of death. C.R. 292. *(See Appendix Vol. 1, Exhibit #2, copy of trial court docket sheet)*

Direct appeal was automatic, pursuant to Tex. Code Crim. Proc. Ann. Art. 37.071(h); Tex.R.App. Proc § 71.1. Mr. Wilson filed his brief February 26, 1999, *(See Appendix Vol. 1, Exhibit #3, copy of petitioner's direct appeal brief)* and the State filed its reply brief August 2, 1999. *(See Appendix Vol. 1, Exhibit #4, copy of state's direct appeal reply brief)* The Texas Court of Criminal Appeals affirmed the trial court judgment and sentence on December 8, 1999. *(See Appendix Vol. 1, Exhibit #5, copy of the 1999 Texas Court of Criminal Appeals opinion)*

3

A Motion for Rehearing was not filed.  A Petition for Writ of Certiorari was not filed.

The Texas Court of Criminal Appeals appointed the undersigned to represent Mr. Wilson concerning his post-conviction application for writ of habeas corpus.  Mr. Wilson's state application for writ of habeas corpus was filed December 27, 1999. *(See Appendix Vol. 2, Exhibit #6, copy of petitioner's state application for writ of habeas corpus)* The State's response was filed April 20, 2000.  *(See Appendix Vol. 2, Exhibit #7, copy of state's answer to petitioner's state application for writ of habeas corpus and corrected exhibit to state's answer)*

An order for filing proposed findings of fact and conclusion of law was entered July 20, 2000, with the affidavits of trial and appellate counsel attached. *(See Appendix Vol. 2, Exhibit #8, copy of the order and affidavits).* Findings of Fact, Conclusions of Law, and Order were filed on August 16, 2000, recommending that relief be denied. *(See Appendix Vol. 2, Exhibit #9)*  On October 11, 2000, the Texas Court of Criminal Appeals issued its Order denying the relief sought. *(See Appendix Vol. 2, Exhibit #10)*

On May 11, 2001, the United States District Court for the Eastern District of Texas appointed the undersigned to represent Mr. Wilson for the purpose of preparing and filing a federal habeas corpus petition.

Marvin Lee Wilson is an indigent prisoner on death row at Huntsville, Texas.  The state official responsible for confining Mr. Wilson and putting him on death row is Gary Johnson, Director of the Texas Department of Criminal Justice, Institutional Division.

The trial record in this case consist of the reporter's record is presently 26 volumes, and will be cited as R.R., Vol. __, P.__, L. __, and the clerk's record consist of one volume and one supplemental volume and will be cited as C.R., P. __ and C.S.R., P. ___, respectively.

The Appendix consists of three volumes and will be appropriately cited.

4

## STATEMENT OF FACTS

Jerry Williams was seen on November 9, 1992 on the way to a store, Mike's Drive-In. He was talking to two black guys. R.R. Vol. 15, P. 76-77; 96; 193; R.R. Vol. 16 P. 4. Witnesses saw them hitting Mr. Williams and saying things like "You know what we do to snitches?", "Do you want to die?" and "Give me the gun." R.R. Vol. 15 P. 79; 99-100; 127; 194; R.R. Vol. 16 P. 5. Mr. Williams got away and they chased him across the street and caught him. He was pulled into an old-model dark color car and drove toward the Mobil refinery. R.R. Vol. 15 P. 100-101; 195-196; R.R. Vol. 16 P. 5-6. Mr. Williams' wallet and jacket and watch were retrieved. R.R. Vol. 15 P. 81. Later a sound like gunshots was heard at a nearby apartment. R.R. Vol. 15 P. 197; R.R. Vol. 16 P. 8. On November 10, 1992, a bus driver noticed Mr. Williams' dead body on the side of the road. An autopsy showed Jerry Williams died from three gunshot wounds. R.R. Vol 15 P. 185-190. During the investigation, Mr. Williams was found to have a white hair between his fingers. R.R., Vol. 15, P. 57. The state did not test the white hair because it was different race than the victim and defendant. R.R. Vol. 18 P. 39.

Dr. Proctor testified that victim killed sometime after 4:00 a.m. because of the fixed dependent lividity. R.R. Vol. 20 P. 5. Additionally the white hair found was pulled out and had material to perform DNA testing. R.R. Vol. 20 P. 8-9. Steve Thrower testified in rebuttal that the shooting had to occur around 6:00 or 6:30 p.m. on November 9, 1992. R.R. Vol. 22 P. 1-2.

The court allowed evidence of an extraneous offense admitted to show motive. R.R. Vol. 17. Beaumont Police Department executed a search warrant on November 4, 1992 at 2192 Brickyard in Beaumont, Texas. R.R. Vol. 18 P. 2. Appellant was arrested at the location for possession of controlled substance. Cocaine was found sitting on a plate atop a microwave. R.R. Vol. 18 P. 5. Jerry Williams was the confidential informant used for the search warrant. R.R.

Vol. 18 P. 12. The drug was tested positive as cocaine and weighed approximately 25 grams. R.R. Vol. 18 P. 12. Clay Woodword and Robert Roberts testified that a search warrant was executed on a house on Brickyard Street in Beaumont, Texas on April 9, 1992. R.R. Vol. 23 P. 49. Appellant was observed throwing down a rock of cocaine. R.R. Vol. 23 P. 38. Appellant was arrested for possession of controlled substance. It was tested positive as cocaine with a weight of 1.59 grams. R.R. Vol. 23 P. 59.

Jerry Williams told law enforcement officers that "Gun" was after him. Vincent Webb had the nickname "Gun". R.R. Vol. 18 P. 14.

LinMarie Garsee testified that the State's witnesses were known prostitutes and drug users. R.R. Vol. 20 P. 55.

Carl Rose, an investigator for Jefferson County District Attorney's Office, was qualified as a fingerprint expert. R.R. Vol. 23 P. 1-4. He identified Appellant's fingerprints on the judgments for two priors of Aggravated Robbery and one prior Robbery. R.R. Vol. 23 P. 5.

David Froman R.R. Vol. 23 P. 13, Chris Padgett R.R. Vol. 23 P. 18, Bill Gates R.R. Vol. 23 P. 25, and Chuck Little R.R. Vol. 23 P. 29, law enforcement officers testified that Appellant had a bad reputation for lawfulness and peacefulness.

Ron Womack, the victim of an aggravated robbery on July 3, 1981, testified that Appellant was the individual who robbed him. Womack was working as a clerk in a store when Appellant demanded money while displaying a shotgun. R.R. Vol. 23 P. 63-66.

The defense called several character witnesses for Petitioner. His sister, Kim Armstrong, related the family's rough upbringing. She detailed their father's physical abuse and how Petitioner stole so the family could eat. R.R. Vol. 23 P. 73-76. Walter Kelly, a family friend, confirmed the problems Petitioner had with his family. R.R. Vol. 23 P. 85. Randy Williamson, a

Jefferson County Sheriff's Deputy, testified  Petitioner never showed any signs of violence in the approximate 150 times he was around him.  R.R. Vol. 23 P. 97-98.

Dr. Gripon, psychiatrist, examined Appellant and testified that Appellant would not be a further danger.  R.R. Vol. 25 P. 7.

Dr. Quijano, clinical psychologist, testified that the correctional system had variety of ways to classify inmates.  R.R. Vol. 25 P. 24.  They are inmates who are sentenced to life from capital murder.  He would have informed the jury that life meant thirty-five years but this was overruled.  R.R. Vol. 25 P. 75-80.

## <u>STATUS OF PETITION</u>

The provisions of §2254, Rule 4, generally provide that when a petition is filed, it must be promptly presented to and examined by the judge to whom it is assigned. The petitioner believes that prior to the time this Court rules on the merits of this petition, the respondent should be required to answer the petition and file such portions of the transcripts as the respondent deems appropriate. *See* §2254, Rule 5. If the respondent is allowed to bypass the requirement to file an answer, this Court will shift to the petitioner the burden to file the record. This action increases the petitioner's already heavy burden with regard to providing the court with a procedural, factual and legal record.

# CLAIM FOR RELIEF[1]

## I.

Petitioner's rights under the 8th and 14th Amendments to the United States Constitution were violated by the failure to inform the jury that petitioner would not be eligible for parole until he served 35 years.

### A. Factual Background

Prior to individual voir dire, Petitioner moved the trial court to allow the defense to inform them that a capital punishment life in this case represents a 35 year sentence before eligibility for parole. He objected that the failure to inform the jury violates the defendant's 8th and 14th Amendment rights under the United States Constitution. R.R., Vol. 2, P. 13, L. 13--P. 14, L. 13.

During the defense's case-in-chief, Petitioner called Randy Williamson. R.R., Vol. 23, P. 96. Mr. Williamson testified that he was employed by the Jefferson County Sheriff's Department for 19 years and had the opportunity to be around Petitioner as many as 150 times. R.R., Vol. 23, P. 97. During that time, he stated that Petitioner was never violent or tried to break and run away. R.R., Vol. 23, P. 97, Ll. 16-25. When questioned about the fact that Petitioner was convicted of capital murder, Mr. Williamson would not change his opinion of Petitioner. R.R., Vol. 23, P. 98, Ll. 1-6.

Next, the defense called Dr. Edward Gripon, a forensic psychiatrist since 1972, who has extensive experience and a varied practice. R.R., Vol. 23, P. 101, Ll. 3-25. Dr. Gripon has testified for both the State and the defense on many occasions. R.R., Vol. 23, P. 102, Ll. 7-24. He testified that, in this case, a repeated pattern of robbery doesn't show a pattern of violence since no one was injured, and that history of the robbery alone shouldn't be used to assess future

---

[1] All record excerpts under this claim are provided in the order of appearance in the Appendix Vol. 3, Exhibit 11

dangerousness. R.R., Vol. 23, P. 106, Ll. 6-25. He stated that Petitioner is 40 years old. R.R., Vol. 23, P. 108, Ll. 24. He further concluded, "the most violent people in society are between the ages of 19 and 26. Now, older people can be violent; but the percentages tail-off as one gets older. So, certainly there's a less likelihood. And also, by age 40, certainly, if you're going to have a pattern of violent behavior, you should long since have seen it." R.R., Vol. 23, P. 109, Ll. 8-14

Dr. Gripon testified that his review of Petitioner's prison records did not indicate any violent acts, merely minor disciplinary activity. R.R., Vol. 25, P. 2-3. Having done over 6, 000 competency examinations and treating over 10,000-12,000 mental patients, he did not see anything in Petitioner's record to suggest he had a history of repeated acts of violence. R.R., Vol. 25, P. 5, Ll. 22-25.

The defense next called Dr. Walter Quijano, a doctorate in clinical psychology. R.R., Vol. 25, P. 19. He was Chief Psychologist and Director of Psychiatric Services of the Texas Department of Corrections (TDC). R.R., Vol. 25, P. 20, Ll. 5-12. He testified about prison classification generally. He stated that murderers are good inmates. They do their time well, in general. R.R., Vol. 25, P. 41, Ll. 15-17. And when questioned about murder in TDC, he stated that statistics would show that the incidence of murder in TDC is lower than in the free world population. R.R., Vol. 25, P. 42, Ll. 17-24.

The defense made an offer of proof by re-calling Dr. Quijano. P. 75. For purposes of the record, he stated that Petitioner's minimum time to be served would be 35 years. R.R., Vol. 25, P. 76, Ll. 16-17. Dr. Walter Quijano testified that in his experience in working within the prison system *he has never known a life capital murderer to be paroled*. R.R. Vol. 25, P. 76, Ll. 19-24. When questioned about a Petitioner's age, Dr. Quijano testified that age is an important factor in

recidivism and that as a person ages the recidivism rates drops. Specifically, he states, "In both the prison and free society, violent crimes committed by people 50 years and older constitute less than one percent of the total crimes. R.R. Vol. 25, P. 77, Ll. 6-17. At the time of trial, Petitioner was 40 years old; therefore, Petitioner would not be eligible for consideration for parole until he was 69 years old.

At the close of the punishment phase, the trial court included the following instruction within the punishment jury charge.   During your deliberations, you will not consider or discuss any possible action of the Board of Pardons and Paroles or the Governor.  C.R., P. 293 (*See Appendix, Vol. 3, Exhibit #12*)

During punishment deliberation the jury sent a note asking, "If "life sentence" how long can serve?" [sic]  R.R. Vol. 26, Court's Exhibit 13, question 2. (*See Appendix Vol. 3, Exhibit #13*)

### B.    *Argument and Authorities*

The Due Process Clause does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977). Petitioner was denied due process and due course of law in violation of *Simmons v. South Carolina*  and the Eighth and Fourteenth Amendment rights under the United States Constitution when the trial court disallowed accurate information regarding parole eligibility to be furnished to the jury. 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In related issues, Petitioner claims that the same rulings deprived him of the right to be free from cruel and unusual punishment guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner argues that the accurate information regarding parole eligibility was relevant to whether he would be a continuing threat to society. The trial court prevented the jury from weighing the mitigating effect of punishment testimony that Petitioner, given his age and past behavior in a prison setting, would not likely pose a future threat while incarcerated for an absolute minimum number of years.

At the time of Petitioner's trial, Texas law prohibited the prosecution and the defense from informing jurors of parole eligibility for a defendant sentenced for life imprisonment for capital murder. Tex. Code Crim. Proc. Ann. art 37.07, sec. 4(a). However, this section expressly stated that specific information on parole eligibility may be charged to the jury in a non-capital offense The U. S. Supreme Court has recognized this troubling distinction in its warning in *Brown v. State, supra,* by commenting, that "perversely, however, in capital cases, Texas law prohibits the judge from letting the jury know when the defendant will become eligible for parole if he is not sentenced to death." The Texas rule unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose. *Brown v. Texas*, 522 U.S. 940, 118 S.Ct. 355, 139 L.Ed.2d 276 (1997).

By informing noncapital jurors about parole eligibility, the Texas Legislature acknowledged the importance of making noncapital jurors aware of all sentencing options. Id. Interestingly, the Texas Legislature amended Tex. Code Crim. Proc. Ann. art. 37.071 to allow the defendant to charge the jury regarding parole eligibility. (1999 Tex. Sess. Law Serv. Ch. 140 (SB 39) (Vernon's)(effective Sept. 1, 1999, for capital crimes committed after the effective date).

The Texas Court of Criminal Appeals has repeatedly held that parole eligibility is not a proper consideration at sentencing in a capital case. See, e.g., *Santellan v. State*, 939 S.W.2d 155, 170 (Tex.Crim.App.1997); *Ford v. State*, 919 S.W.2d 107, 116 (Tex.Crim.App.1996);

*Smith v. State*, 898 S.W.2d 838, 846  (Tex.Crim.App.1995) (plurality opinion), cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995).  The Texas Court has repeatedly held the trial court does not violate the United States Constitution or the Texas Constitution in refusing to give such an instruction.  *Green v. State*, 934 S.W.2d 92, 105 (Tex.Crim.App.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997);  *Smith*, 898 S.W.2d at 846;  see also *Cantu v. State*, 939 S.W.2d 627 (Tex.Crim.App.1997).

Petitioner acknowledges that precedent from the Texas Court of Criminal Appeals weighs heavily against him on all constitutional grounds. *Smith v. State*, 898 S.W.2d 838 (Tex.Cr.App.1995), but urges reconsideration of those opinions in light of the great similarity between the facts of his case and *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), and the U.S. Supreme Court decision in *Brown v. Texas, supra*. Furthermore, Petitioner would show that in *Shannon v. State*, the Court suggested that any distinguishing evidence such as an offer of proof of Petitioner's ability to live peaceably in prison or expert testimony relating to a probable decline in Petitioner's propensity for violence may give the Court a reason to revisit *Smith*. 942 S.W.2d 591, 596 (Tex. Crim. App.  )

The Supreme Court observed in *Simmons* that "prosecutors in South Carolina, like those in other States that impose the death penalty, frequently emphasize a defendant's future dangerousness in their evidence and argument at the sentencing phase; they urge the jury to sentence the defendant to death so that he will not be a danger to the public if released from prison." *Simmons*, 512 U.S. at ----, 114 S.Ct. at 2193, 129 L.Ed.2d at 142, *citing* Eiseberg & Wells, "Deadly Confusion:  Juror Instructions in Capital Cases,"  79 Cornell L.Rev. 1, 4 (1993). Moreover,  "[i]n assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors constant, it is entirely reasonable for

a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not.   Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole." *Simmons*, 512 U.S. at ----, 114 S.Ct. at 2194, 129 L.Ed.2d at 142.

The Texas Court has held that Petitioner cannot be prevented from presenting mitigation evidence to the jury. *Matson v. State*, 819 S.W.2d 839, 850-51 (Tex.Crim.App.1991) However, without instructions on the applicable parole eligibility law, Petitioner was unable to emphasize for the jury the full mitigating impact of this evidence as it related to the statutory issue whether he would pose a continuing threat to society.

Due to jurors' inability to "give effect" to relevant mitigating evidence of decreased recidivism and violence over time, the trial court unconstitutionally denied Petitioner's minimum incarceration period instruction.   See *Smith*, 898 S.W.2d at 874-86 (Maloney, J., dissenting).

Under Texas law, parole is not a proper topic for jury deliberation. See, e.g., *Smith v. State*, 898 S.W.2d 838, 849 (Tex.Crim.App.)(Texas Constitution prohibits jury consideration of parole during sentencing phase of capital murder trial unless legislature enacts laws to contrary), *cert. denied*, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995).   Courts do, however, recognize that jury notes regarding parole suggests that jurors are "discussing" and "considering" parole.  Arnold v. State, 786 S.W.2d 295, 305 (Tex.Crim.App.), cert. denied, 498 U.S. 838, 111 S.Ct. 110, 112 L.Ed.2d 80 (1990).

In the present case, after being instructed that parole should not be considered, the jury expressed just such concern during deliberations by asking the trial court "[I]f life sentence, how long".  Such is proof positive of the unfairness of not allowing the jury to have full and complete information in a decision where their choice is Life or Death.

14

## C.  Request for Relief

The record excerpts and jury note shows that "but for" the refused jury instruction regarding the minimum time of 35 years a defendant could have to serve before becoming eligible for parole, Petitioner could have received a life sentence rather than a death penalty. It must be remembered counsel for Petitioner asked that this information be furnished during voir dire but was refused; asked for a charge in the jury following testimony is punishment before but was refused again.  The sentencing jury even questioned the trial court about the length of time the Petitioner would have to serve before being eligible for parole after instructed not to consider parole.

Mr. Wilson should be granted a new trial because the trial court violated the dictates of *Simmons*, and the Eight and Fourteenth Amendments rights under the United States Constitution, In refusing to allow the jury to consider the mitigating factor of an absolute minimum incarceration for 35 years, even though requested by the defense and the jury,

# CLAIM FOR RELIEF[2]

## II.

Petitioner's Conviction was based on an Unconstitutionally Vague
and Overbroad Statute in Violation of the 8th and 14th Amendments
to the United States Constitution.

### A.    *Factual Background*

Petitioner was indicted December 18, 1992, for "intentionally cause [sic] the death of an

individual, namely, Jerry Robert Williams, hereafter styled the Complainant, by shooting

Complainant with a deadly weapon, to wit: a firearm, and the Defendant was then and there in

the course of committing and attempting to commit the offense of kidnapping of Jerry Robert

Williams. (See Appendix Vol. 3, Exhibit #15)   At approximately 6 p.m. on the 9th day of

November, 1992, the victim in this case, Jerry Williams, was seen to have either been fighting or

the recipient of blows being struck and/or being chased, caught and forced into an automobile.

R.R., Vol. 15, P. 100-101; 195-196; Vol. 16, P. 5-6. There are varied discrepancies in testimony,

but apparently Jerry got into an automobile.  Later, a noise was heard which witnesses assumed

to be gunshots.  R.R. Vol. 15, P. 197; Vol. 16, P. 8.  Jerry Williams was found dead some 12 ½

to 13 hours later a few city blocks from the initial point of observance. R.R. Vol. 20, P. 5.  By

confusing testimony, two people were identified as those who supposedly forced the victim into

the automobile.

Therefore, the scenario ostensibly is this!  Two people, questionably identified as the

Petitioner and Terry Lewis, forced the victim into an automobile and then sped away.  Within a

few minutes, noises and are heard which testimony presumes to be the sound of gunshots. R.R.

Vol. 15, P. 197.   Then the body of the victim is discovered 12-13 hours later.  Assuming all

---

[2] All record excerpts under this claim are provided in the order of appearance in the Appendix Vol. 3,  Exhibit 14

16

facets of the story to be true, it is surmised that these 2 people participated in the death of Jerry Williams and that this death occurred not more than 10 minutes after being forced into this automobile. The question then becomes whether this purported maximum 10-minute detention was kidnapping or an incident to the alleged murder. All things being considered in the light most favorable to the conclusion of the scenario would indicate that the 2 so-called perpetrators intended to kill the victim and the use of the automobile was brought about because Jerry was discovered in a place not conducive to murder; necessitating a change in locations. This renders such transfer to be an incident of the murder and not the capital murder.

## B.    *Argument and Authorities*

The Tex. Penal Code Ann. Sec 1903(a)(2) provides, in pertinent part, that a person commits the offense of capital murder if "the person commits murder in the course of committing or attempting to commit kidnapping..." Accordingly, the complained of statutory factor in the present case is committing or attempting to commit kidnapping.

The disposition of this claim is governed by the standards articulated in *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 30902, 111 L.Ed. 2d 606 (1990). In *Jeffers*, the Supreme Court reaffirmed the fundamental principle that, to satisfy the Eighth and Fourteenth Amendments, a capital sentencing scheme must suitably direct and limit the sentencer's discretion so as to minimize the risk of wholly arbitrary and capricious action. *Id.* at 774, 110 S.C.t at 3099 (quoting *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976) joint opinion of Stewart, Powell and Stevens, JJ)). The State must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death.

17

The Eighth Amendment principle of guided discretion requires an objective standard for determining whether the defendant is eligible for the death penalty. The sentencer must find at least one statutory aggravating circumstance that genuinely narrows the class of persons eligible for the death penalty and reasonably justifies the imposition of a harsher punishment for murder. The principle of guided discretion includes two related doctrines called vagueness and overbreath. A statutory aggravating circumstance is void for vagueness if it does not adequately inform the sentencer of facts that must be found before the death penalty can be imposed. A statutory aggravating circumstance is overbroad if it requires the sentencer to find facts that are present in virtually all murder cases. *Arave v. Creech*, 113 S.Ct. at 1542

U. S. Supreme Court death penalty jurisprudence makes clear that a State's capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty. *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). Although not bound by the State's interpretation of its aggravating circumstances sufficient to justify the death penalty, when the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. See *Lewis v. Jeffers*, 497 U.S. 764, 776, 110 S.Ct. at 3100 (1990) ; *Godfrey v Georgia*, 466 U.S. 420, 433, 100 S. Ct. at 1767 (1980). If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance in constitutionally infirm.. See *Mayard v. Cartwright*, 486 U.S. 364, 108 S.Ct. at 1859 (1988) (invalidating aggravating circumstance that any "ordinary person could honestly believe" described every murder.

A capital sentencing scheme must, in short, provide a "meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases which it is not.

*Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759 (1980)(Quoting *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, quoting *Furman v. Georgia* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346    In *Godfrey*, the Supreme Court found Georgia's statutory aggravating factor unconstitutional. The language allowed death to be imposed if the "offense was outrageously or wantonly vile, horrible or inhumane in that it involved torture, depravity of mind, or an aggravated assault.    The High Court noted "a person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhumane.'" Recognizing that the defendant's crime cannot be said to have reflected a consciously materially more depraved than that of any other person guilty of murder. *Id.* at 433

A facial challenge to a statute is the most difficult challenge to mount successfully because the challenger must establish that no set of circumstances exists under which the statute will be valid. *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Briggs v. State*, 789 S.W.2d 918, 923 (Tex.Cr.App.1990). Since a statute may be valid as applied to one set of facts and invalid as applied to another, "it is incumbent upon the [appellant] to show that in its operation the statute is unconstitutional as to him in his situation; that it may be unconstitutional as to others is not sufficient." *Parent v. State*, 621 S.W.2d 796, 797 (Tex.Cr.App.1981). See *Briggs v. State*, 740 S.W.2d 803, 806 (Tex.Cr.App.1987).

This rule conforms with the criteria for standing to challenge the facial constitutionality of a statute as enunciated by the Supreme Court of the United States:

> A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations. *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 37 L.Ed.2d 830, 93 S.Ct. 2908.

19

The court must begin with a presumption of validity. It is to be presumed that the legislature has not acted unreasonably or arbitrarily, and the burden is on the one who challenges an act to establish its unconstitutionality. *Smith v. Smith*, 720 S.W.2d 586, 597 (Tex.App. - Houston [1st Dist.] 1986, no writ),

The Texas Court of Criminal Appeals has adopted a definition of capital offense of murder during the course of kidnapping or attempted kidnapping that violates the 8th Amendment doctrine of overbreath. The kidnapping element of the crime only requires the intentional knowing restraint of a person with the intent to prevent her liberation by secreting her in a place where she is not likely to be found or using or attempting to use deadly force. To hold every act of confinement or movement committed in the course of another substantive offense constituted kidnapping, would essentially mean that every robbery and sexual assault, as well as a number of aggravated assaults and murders would have the effect of bootstrapping several murders into capital murder. This, then is in violation of *Furman, infra*. And consequently denies Applicant his rights under the 8th and 14th amendments of the United States Constitution.

The Texas kidnapping statute, utilized by the State as the supporting underlying felony for capital murder, does not limit the class of murderers subject to the death penalty; many criminals could, by moving the victim the slightest distance be subject to capital punishment. Id. In fact, the only murders that would not be subjected to capital punishment under this interpretation would be those in which the defendant walked up and shot the victim as he was found. If the defendant so much as told the victim to stand, he could be convicted of capital murder.

In *Hines v. State*, Appellant successfully challenged the sufficiency of the evidence to establish the essential element of abduction. The operative word in the definition of "abduct" is "restrain." See Tex. Pen.Code Ann. § 20.01(2).

The Hines' Court noted that Texas case law has never defined substantial interference,, however, the cite several cases have addressed factual situations in which interference was found to be substantial:

> Where a defendant has taken and transported a complainant in a vehicle may constitute substantial interference. See *Fann v. State*, 696 S.W.2d 575 (Tex.Crim.App.1985) (forcible removal of complainants to car and driving them around city); *Sanders v. State*, 605 S.W.2d 612, 613-614 (Tex.Crim.App.1980) (defendant stole an automobile with a young boy inside and drove around for hour before apprehension); *Phillips v. State*, 597 S.W.2d 929 (Tex.Crim.App.1980) (defendant gave two hitchhikers a ride, and before releasing them, held them at gunpoint and forced them to perform a sex act); *Gaffney v. State*, 937 S.W.2d 540, 542-543 (Tex.App.--Texarkana 1996, pet. ref'd) (after accepting ride with the complainant, defendant said he had a pistol and made complainant drive around for 45 minutes before finally robbing him); *Polk v. State*, 865 S.W.2d 627, 629 (Tex.App.--Fort Worth 1993, pet. ref'd) (defendant grabbed the complainant at gun point, placed her in car and drove away); *Linder v. State*, 734 S.W.2d 168, 172 (Tex.App.--Waco 1987, pet. ref'd) (bail bondsman pulling shot gun on the complainant, handcuffing him, placing him in car and transporting him to sheriff's office). See also *Mahaffey v. State*, 833 S.W.2d 678, 679 (Tex.App.--Fort Worth 1992, no pet.); *Wiley v. State*, 820 S.W.2d 401, 407-09 (Tex.App.--Beaumont 1991, no pet.); *Arevalo v. State*, 749 S.W.2d 271, 275-76 (Tex.App.--San Antonio 1988, pet. ref'd).

Those cases, however, have not squarely addressed the meaning of substantial interference and none examined the scope of the kidnapping statute. See *Phillips v. State*, 597 S.W.2d 929, 936 (Tex.Crim.App.1980) (to commit aggravated kidnapping, one must have committed kidnapping). When interpreting a statute, appellate courts should look first to its plain language. See *Boykin v. State*, 818 S.W.2d 782, 785-786 (Tex.Crim.App.1991). When the statutory language is ambiguous, we may consider extra-textual factors to determine legislative intent. See ibid. The plain language of section 20.01(1)(A) makes clear that simple restraint is

insufficient to constitute kidnapping, but is nevertheless ambiguous regarding what constitutes substantial interference. *Id.*

The Hines' Court went further and reviewed the legislative history, commentaries, revisions and cases from jurisdictions from which the statute was derived and determined that Appellant's actions, which fitting the definition of kidnapping, were part and parcel of the aggravated robbery. They noted that a potential danger which a rational penal code must avoid is that the definition of kidnapping will sweep within its scope conduct that is decidedly wrongful but that should be punished as some other crime. Thus, for example, the robber who forces his victim to move from one room to another in order to find a cashbox or open a safe technically may commit kidnapping as well as robbery. They reasoned that this interpretation raises the possibility of cumulative penalties or of higher sanctions for kidnapping, even though the "removal" of the victim to another place was part and parcel of the robbery and not an independent wrong.   Experience reveals numerous instances of abusive prosecution under expansive kidnapping statutes for conduct that a rational and mature penal law would have treated as another crime. M.P.C. § 212.1, Commentary, p. 220-221. Thus, by requiring "substantial" movement or confinement of a complainant, the Model Penal Code attempted to exclude from the scope of kidnapping restraint or movement that was either trivial, or merely incidental to another substantive offense. M.P.C. § 212.1, Commentary 2, p. 232.   *Hines v. State*, 40 S.W.3d 705-714 (Tex. App. Houston[1st Dist.] 2001, no pet).

## C.     *Request for Relief*

Petitioner requests the Court review these facts and precedents and following such review reverse this case and remand same to the trial Court for a new trial; or, alternatively, reverse and remand the punishment portion of this trial for a new punishment to be assessed for the offense

of murder; or, alternatively, commute the sentence to life imprisonment is the Institutional

Division of the Texas Department of Criminal Justice for the offense of murder.

# CLAIM FOR RELIEF[3]

## III.

Petitioner's Rights Were Violated Under the 6th Amendment and the Equal Protection Clause of the 14 Amendment of the United States Constitution.

### A. *Factual Background*

Prior to trial, Petitioner moved the trial court to prevent the State from striking minority members in a racially discriminatory manner. After general and individual voir dire, the trial court began the jury selection process. Out of fifteen peremptory strikes, the prosecutor used his peremptory challenges to eliminate 7 African Americans. Vol. 12, P. 10, L. 24—P. 11, L. 2.. The Petitioner, Mr. Wilson, is also a member of the African American race. R.R., Vol. 12, P. 11, Ll. 13-14.

The following provides the State's basis for striking the minority members:

African American Juror No. 3, Euraline Andrus, was struck because the prosecutor believed she was extremely weak on the death penalty. She also had two sons who she said were treated unfairly by the criminal justice system; and, according to the State, their office prosecuted both of them. R.R., Vol. 12, P. 12, Ll. 12-22. Yet, when questioned by the trial judge, this juror said she could answer the special questions in such a way as to give the death penalty. Vol. 3, P. 76, Ll. 15-23. With regard to Ms. Andrus being "death soft", Juror No. 38, Mary Mauer explained she was softhearted. Vol. 9, P. 55, Ll5-6. Although struck by the defense, the State accepted Juror No. 2, Kelly Meaux who was noncommittal regarding her ability to answer questions in such a manner as to result in the death of the defendant, i.e., during individual voir,

---

[3] Vol. 12 in its entirety is included in Appendix Vol. 3, Exhibit16. All other record excerpts under this claim are provided in the order of appearance in the Appendix Vol. 3, Exhibit 17

she was stated that she thought she could give the death penalty. P. 37, LL. 18-20.   With respect to being treated unfairly by the criminal justice system, the State accepted Juror No. 6, John Murphy, even though he felt he had been very betrayed by the legal system. Vol. 3, P. 126, Ll. 1-5.  Juror No. 24, Lisa Ann Phillips, was accepted even though she had friends of the family in the penitentiary. Vol. 6, P. 93, Ll. 19-25

African American Juror No. 10, Tammy Ruffin, was struck by the State because she didn't consider aggravated robbery to be a serious crime, and that she wanted too badly to be on the jury and that although age was improper she was immature mentally. R.R., Vol. 12, P. 12, L. 23—P. 13, L. 11.  With regard to wanting to be on the jury, Ms. Ruffin was studying criminal justice, and the following potential white jurors expressed a desire to be on the jury: Juror No. 2, Kelli Meaux stated she had no problem being on the jury, R.R., Vol. 3, P. 44, Ll. 10-12;  Juror No. 14, Robert Huckaby, who stated he looked forward to being on the jury,  Vol. 4, P. 138, Ll. 13-14; Juror No. 16, Viole Willis is a seventy year old who claimed that he wanted to be on the jury because he wanted to serve his community. Vol. 4, P.158; Juror No 20, Jack Olivier, wanted to be on the jury, Vol. 5, P. 88, Ll. 1-6; Juror No. 32, Clifford Tomplait wanted to be on the jury, Vol. 7, P. 156, Ll. 19-20; Juror No. 40, Christene Thompson, when asked if she wanted to be on the jury replied, I think so, Vol. 9, P. 102, Ll. 1-2; and, finally,  Juror No. 43, Michael McFarland claimed that he would like to be on the jury, Vol. 10, P. 41, Ll. 18-24.

African American Juror No. 19, Cynthia Robertson, was struck by the State because she was equivocal about the death penalty, did not know the trial was a two part system after being told, and her job exposes her to fact situations that causes inmates to go to jail. Vol. 12, P. 13, L. 12 – P. 14, L. 7.  Juror No. 1, Ms. Latrell Guidry, was accepted by the state although she was a drug abuse counselor, Vol. 3, P. 19, and clients she works with go the prison, R.R, Vol. 26,

of the fact that she hung the jury.  Vol. 12, P. 15, L.25—P. 16, L. 9.   However, White Juror

Dianna Kasper also had been a member of a hung jury. Vol. 10, P. 71, Ll. 4-8.

After the State gave its reasons for striking these minority members, the Court ruled that

"having heard the reasons, the Court finds no violation of Article 35.261 of the Code of Criminal

Procedure. The strikes were justified. Okay, are you-all ready to begin, or do we need to wait."

R.R., Vol. 12, P. 16, Ll. 10-14.

## B.   *Argument and Authorities*

Under *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a

prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent

of the strike to come forward with a race-neutral explanation (step 2).   If a race-neutral

explanation is tendered, then the trial court must then decide whether the opponent of the strike

has proved racial discrimination (step 3).  *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S.Ct. 1769,

1772, 131 L.Ed. 2d 834, 839.  The appellate standard of review requires a review of the record of

the *Batson* hearing and the voir dire examination in the light most favorable to the trial court's

ruling, and will not disturb a trail court's ruling on a *Batson* issue unless it is clearly erroneous.

*Adanandus v. State*, 866 S.W.2d 210, 224 (Tex. Crim App. 1993).

### STEP 1 Analysis

With respect to step one, the Supreme Court has held that once the prosecutor has

provided race neutral explanations, the explanations and not the prima facia showing are to be

reviewed by the appellate court because the primary issue of whether the defendant has made a

prima facia showing becomes moot. *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114

L.Ed. 2d 395;  *Hill v. State*, 827 S.W.2d 860 (Tex. Cr. App. 1992).

In the instant case, the prosecutor gave explanations for the use of his peremptory strikes before the trial court ruled on the *Batson* challenge. R.R., Vol. 12, P. 12, L. 12. Accordingly, the issue of whether the defendant made a prima facia showing of race-based peremptory strikes is moot. Therefore, the analysis continues.

### STEP 2 Analysis

Once the defendant makes a prima facia case of racial discrimination, the burden shifts to the proponent of the strike to rebut the prima facia case. Step 2 of the *Batson* analysis does not demand an explanation that is persuasive or even plausible. "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed neutral." *Purkett,* supra, (citing *Hernandez v. New York,* 500 U.S. at 360, 111 S.Ct. 1859, 114 L. Ed. 2d 395(plurality opinion)(O'Conner, J., concurring in judgment).

The Supreme Court in *Batson* explained that to rebut a prima facia case the proponent of the strike must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges and the reason must be related to the particular case to be tried. In *Purkett,* the Supreme Court interpreted this *Batson* directive to mean that "[t]his warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by legitimate reason is not a reason that makes sense, but a reason that does not deny equal protection." *Id.*

### STEP 3 Analysis

It is not until the third step that the persuasiveness of the justification becomes relevant— the step in which the trial court determines whether the opponent of the strike has carried his

burden of proving purposeful discrimination. At this step, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. *Id.*

"Implicit in the *Batson* decision, so as to promote equal protection under the law, is the provision that we must examine every reason given by the prosecutor for the strike of a black veniremember within the circumstance of that particular case to determine whether the neutral explanation for the strike is really a pretext for a racially motivated peremptory challenge. Thus, an appellate court is required to review the rationale for each strike which an appellant prima facially establishes as racially-motivated in spite of seemingly neutral rationale offered by the prosecutor." *Whitsey v. State*, 796 S.W. 2d 707, 713 (Tex.Cr.App. 1989) (en banc).

As stated in *Batson*, the prosecutor must articulate a race neutral explanation related to the particular case to be tried. That requirement, however, is not sufficient to overcome appellant's prima facia showing of purposeful discrimination. The prosecutor must give clear and reasonably specific explanations of legitimate reasons for his use of peremptory challenges. Such a requirement mandates that the trial judge evaluate the reasons given by the prosecutor in light of the circumstances of that trial to determine whether the explanations are merely pretext. *Id.*

The *Whitsey* court observed that in *Keeton II* the court discussed the nonexclusive list of factors which weigh against the legitimacy of a race-neutral explanation. The presence of any one of these factors tends to show that the State's reasons are not actually supported by the record and are an impermissible pretext. Those factors which the court employed were:

1. The reason given for the peremptory challenge is not related to the facts of the case;

2. There was a lack of questioning to the challenged juror or a lack of meaningful questions;

3. Disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck;

4. Disparate examination of the members of the venire, i.e., questioning a challenged juror so as to provoke a response without asking the same questions of other panel members; and

5. An explanation based on a group bias when the group trait is not shown to apply to the challenge juror specifically.

The following cases provide examples of legitimate explanations offered by the State's prosecutor which this Court has upheld under *Batson* and its progeny:

In *Adanandus v. State*, the prosecutor offered several race-neutral reasons why the juror was struck, including her vague and unsure answers about the imposition of the death penalty and her having to be escorted to the courthouse by the sheriff for being one and one-half hours late for jury duty. And the prosecutor did not want anyone with a background in psychology--this juror had sixty hours. 866 S.W. 2d 210 (Tex. Cr. App. 1993).

Another example is found in *Cantu v. State*. In this case, the prosecutor struck a Hispanic member, the defendant was also Hispanic. This Court affirmed the trial court's ruling on the *Batson* challenge because the prosecutor provided at least seven, race-neutral explanations for striking the juror. 842 S.W. 2d 667, 687-89 (Tex. Cr. App. 1992).

Another example is *Harris v. State*, in which the prosecutor struck four (4) African American members and defendant was also African American. The race-neutral explanations the prosecutor gave were that, inter alia, one had a brother on probation for 8 years for burglary, another would have held the State to proof beyond any and all reasonable doubt, another expressed an inability to assess death, and the remaining one because she could never answer yes to the two punishment issues in a death penalty case. 827 S.W.2d 949 (Tex. Cr. App. 1992).

30

In *Keeton v. State,* a capital murder case, the prosecutor struck three venire persons of the same race as defendant with one African American remaining on the jury.  The prosecutor stated that he struck the first one because of 3 misdemeanor convictions.  The next person was struck on the basis of her knowledge of and relationship to the defendant's family.  The third person was struck because he vacillated a great deal on whether he would hold the state to a higher burden in a death penalty case. 749 S.W.2d 861, (Tex. Cr. App. 1988).

Considering the *Keeton* factors, the State engaged in disparate treatment of persons with the same or similar characteristics, i.e., "death soft", being treated unfairly by the criminal justice system, wanting to be on a capital jury, not knowing the nuances of criminal trials, knowing people that have gone to the penitentiary.

Whether the strikes are considered independently, in combination, or collectively, the State's reasons where merely shams.  If ever there was a case where the State used its peremptory strikes to exclude minority participation, this is the one. The record on voir dire is void of any testimony which would indicate that these jurors were challenged on the basis of anything but race.

**C.**   ***Request for Relief***

Accordingly, this cause should be reversed and remanded for a new trial.

# CLAIM FOR RELIEF[4]

## IV.

Petitioner's Due Process Rights Under the 4th Amendment to the United States Constitution were Violated by the Introduction of Evidence Seized Under Invalid Search Warrants.

### A. *Factual Background*

Petitioner moved to suppress evidence seized pursuant to search warrants of April 9, 1992, and November 4, 1992. (See Appendix Vol. 3, Exhibit 19)  On February 9, 1998, the trial court conducted, a hearing to determine the validity of both search warrants. R.R. Vol. 13.

At this hearing, the State called Officer Robert Roberts to testify. R.R. Vol. 13, P. 3. Officer Roberts testified that he was assigned to the narcotics division of the Beaumont Police Department and had been in that department for seven years. R.R., Vol. 13, P. 4, Ll. 3-10. Therefore, when Officer Roberts discovered what he executed the search warrants in 1992, he had been a narcotics investigator for little more than one year.  He testified that he executed both search warrants at 2192 Brickyard, Beaumont, Texas.   He discovered what he believed to be crack cocaine during the search. R.R. Vol. 13, P. 4, Ll. 14-22; P. 6, Ll. 1-14.  Officer Roberts identified the search  warrants and testified that he filled out the information and affidavits for the warrants. R.R., Vol. 13, P. 5, Ll. 15-23; P. 6, Ll. 15-21.  The search warrant's were admitted for the purposes of the hearing. R.R., Vol. 13, P. 7, Ll. 4-11.

On cross-examination, Detective Roberts identified the confidential informant as Jerry Williams upon whose reliance he based his probable cause affidavit in securing the November 4, 1992 search warrant-State's Exhibit 32.  The affidavit states the information contained therein was received from the confidential informant within the preceding 72 hours. However, Detective

---

[4] All record excerpts under this claim are provided in the order of appearance in the Appendix Vol. 3, Exhibit 18

Roberts could not be specific as to the time. R.R., Vol. 13, P. 7, L. 21—P. 8, L. 5.   Detective

Roberts' affidavit states that in the prior 20 months Jerry Williams had given him information on

at least 60 occasions which led to 18 arrests. R.R., Vol. 13, P. 8, Ll. 6-17.   Although Detective

Roberts vouched for Jerry Williams' reputation for truth and veracity as pretty reliable, he kept

no notes. He believed but did not know if Jerry had a criminal record. He did not remember Jerry

incriminating himself by taking or purchasing narcotics.   R.R., Vol. 13, P. 8, L. 6—P. 10, L. 3.

When Detective Roberts was questioned about the April 1992 search warrant-State's Exhibit 33,

he testified that at that time Jerry Williams had been a confidential information for him for

approximately 10 months and that during that time Jerry gave him information on 20 occasions

and at least 16 arrest had been made. R.R., Vol. 13, P. 11, L. 19- 24.   Detective Roberts

conceded that from April to November 1992 Jerry has given him information on 40 or more

instances and only two more arrests had been made. R.R., Vol. 13, P. 25—P. 12, L. 3.

During the guilt/innocence phase of the trial, Detective Roberts testified that he seized a

cable bill from the residence which was addressed to Marvin Wilson at 2192 Brickyard,

Apartment B.  R.R. Vol. 18, P. 10, L. 22—P. 11, L. 16.   The address on the search warrant was

2190 Brickyard. R.R. Vol. 18, P. 19, Ll. 6-14.

At the close of this hearing, Petitioner claims that the affidavits underlying the search

warrants fail in their totality to establish sufficient facts to base probable cause because they

were not specific enough, vague as to time, based on hearsay, failure of any personal

observations and that the confidential informant was not reliable.  The trial court did not agree.

R.R., Vol. 13, P. 19, L. 12; C.R., P. 235. The trial court subsequently filed its findings of fact and

conclusions of law on February 17, 1998. C.R. 269

**B.  Argument and Authorities**

A search warrant may not be issued unless it is based upon probable cause.  See U.S. Const. Amend. IV.  To establish probable cause, the affidavit must show facts and circumstances within the affiant's knowledge, arising from a reasonably trustworthy source, to warrant a person of reasonable caution to believe that the items sought are located at the place where it is proposed to search.  *Bower v. State*, 769 S.W.2d 887, 902 (Tex.Crim.App.), cert. denied, 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989).  This determination is made by considering the totality of the circumstances set forth in the affidavit to arrive at a practical, common sense decision as to whether there is a fair probability the items will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *Eisenhauer v. State*, 754 S.W.2d 159, 164 (Tex.Crim.App.), cert. denied, 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988).  However, mere belief or suspicion is not sufficient to sustain the issuance of the search warrant.  *Ware v. State*, 724 S.W.2d 38, 40 (Tex.Crim.App.1986).

### 1.    Reckless Disregard for the Truth

As a general rule, a defendant cannot go behind the four corners of the affidavit to cure or point out defects in the affidavits.  *Miller v. State*, 736 S.W. 2d 643 (Tex.Cr.App. 1987).  There is, however, one important exception to this rule and that is when the affidavit contains false or reckless statements.  In such a case, the defendant is entitled to a *Delaware v. Franks* hearing and thereafter, if the trial court agrees there are defects, then the defects are removed from the affidavit.  If the revised affidavit states probable cause, the fruits of the warrant are admissible. If not, the fruits will be suppressed. 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed. 2d 667 (1978).

In *Massey v. State*, the facial validity of the affidavit was challenged because the officer affiant misrepresented the reliability of the informants and that the informant's criminal history

was omitted. 933 S.W. 2d 141 (Tex.Cr.App. 1996). The Texas Court of Criminal Appeals treats material omissions like material misrepresentations.

The search warrant affidavit failed to provide probable cause where the affidavit relied on uncorroborated information from an informant who was shown to be unreliable. *Barraza v. State*, 900 S.W. 2d 840 (Tex. App.—Corpus Christi, 1995, no writ).

In the present case, Detective Roberts' affidavit states that in the prior 20 months Jerry Williams had given him information on at least 60 occasions which led to 18 arrests. R.R., vol. 13, P. 8, Ll. 6-17. Although Detective Roberts vouched for Jerry Williams' reputation for truth and veracity as pretty reliable, he kept no notes. He believed but did not know if Jerry had a criminal record. He did not remember Jerry incriminating himself by taking or purchasing narcotics. R.R., Vol. 13, P. 8, L. 6—P. 10, L. 3. When Detective Roberts was questioned about the April 1992 search warrant-State's Exhibit 33, he testified that at that time Jerry Williams had been a confidential information for him for approximately 10 months and that during that time Jerry gave him information on 20 occasions and at least 16 arrest had been made. R.R., Vol. 13, P. 11, L. 19- 24. Detective Roberts conceded that from April to November 1992 Jerry has given him information on 40 or more instances and only two more arrests had been made. R.R., Vol. 13, P. 25—P. 12, L. 3. The negligible reliability of the C.I., shows Officer Robert's reckless disregard for the truth.

## 2.     Vague as to Time

When the officer's affidavits in support of the issuance of a search warrant fails to state when the affiant received his information from the informant, when the informant received his information, or when the incident took place, the affidavit is insufficient to support the issuance of a warrant. *Schmidt v. State*, 659 S.W.2d 430 (Tex. Crim. App. 1983). The defendant was stopped a full day after an informant

35

told police that the informant had seen the defendant in possession of drugs.  The police had no new information and no reason to suppose that the defendant possessed drugs at the time of the stop. *Williams v. State*, 938 S.W. 2d 57 (Tex.CR.App.1996)

In the present case, the affidavit states the information contained therein was received from the confidential informant within the preceding 72 hours, however, Detective Roberts could not be specific as to the time. R.R., Vol. 13, P. 7, L. 21—P. 8, L. 5.

### 3.    Vague as to Description

The Texas and United States constitutions prohibit general warrants which fail to particularly describe the property to be seized and prohibits general and exploratory rummaging in a person's belongings.  *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed. 627 (1976);  *Gonzales v. State,* 477 S.W.2d 226 (Tex.Crt.App. 1979).

In the present case the warrant stated that cocaine was being secreted in various places and on suspected persons.  With respect to being secreted, this warrant amounts to a general warrant.

### 4.    Incorrect Address

Search warrant described the premises to be searched as a residence at 1509 Tabor St., Houston, Harris County, Texas.  The search was conducted at 1506 Tabor Street.  There can be no question that the search warrant was invalid as to 1506 Tabor St..   *Rumfulo v. State*, 535 S.W.2d 16 (Tex. App.Hous.[14th Dist] 1976, no writ).   Where premises sought to be searched are described in the search warrant by a certain street number, such description will not authorize a search of some other street number. *Cannady v. State*, 582 S.W.2d 467 (Tex. Crim. Ap. 1979).

In the present case, Detective Roberts testified that while searching the premises, he seized a cable bill from the residence which was addressed to Marvin Wilson at 2192 Brickyard,

Apartment B.  R.R. Vol. 18, P. 10, L. 22—P. 11, L. 16.   The address on the search warrant was 2190 Brickyard.  R.R. Vol. 18, P. 19, Ll. 6-14.  Accordingly, the search as to 2192 is invalid.

During testimony and arguments, the State made references that the confidential informant was assisting law enforcement.  They implied he was killed because of this assistance.  Furthermore the State urged the court to allow the extraneous offenses to be used as motive, specific intent, relationship of the parties and evidence of premeditation.  Vol. 17, P. 6, Ll. 11-19.

## C.     *Request for Relief*

Due to the State's questioning and argument, the evidence seized pursuant to the warrants contributed to both the conviction and punishment.  Accordingly, this case should be reversed and remanded for a new trial.

## CLAIM FOR RELIEF[5]

### V.

Petitioner was Denied Effective Assistance of Counsel at Trial when the Conduct Fell Below an Objective Standard of Reasonableness in such a way as to Undermine Confidence in the Outcome of the Trial in Violation of the Sixth Amendment to the U.S. Constitution.

### A.     *Factual Background*

In Petitioner's trial, Defense counsel failed to gather the probable cause affidavits that were a matter of public record.  Vol. 15, P. 35-36.  Stated in one of the probable cause affidavits was the name of an individual named "Gun." This Gun was a member of a gang called Bloods. Vol. 20, p. 47, Ll. 2-14.

Another error occurred when defense counsel failed to request a charge on the lesser included offense of murder.  Court's charge, C.R.    .

Defense counsel showed up at jail and improperly pressured a material witness to change his story.  Vol. 15, P. 144-150.  This evidence was repeatedly argued by the State during its closing argument.  The fact that the jury was to consider future dangerousness when coupled with these jailhouse visits surely prejudiced the rights of Petitioner.

The biggest blunder occurred when defense counsel performed an in-court comparison. By trying to defend on the basis of identity, defense had a witness named "Gun" stand beside Petitioner trying to show the similarities between Gun and Petitioner.  This failed however, when the State proved that Gun was in jail at the time of the shooting.  Vol. 22, P. 99-100

### B.     *Argument & Authorities*

Petitioner, by way of reference, incorporates Claims I-IV into claim V.

---

[5] All record excerpts under this claim are provided in the order of appearance in the Appendix Vol. 3,  Exhibit 20

The proper standard for determining claims of ineffective assistance under the Sixth Amendment is the standard adopted by the United States Supreme Court in Strickland. The *Strickland* standard was adopted in *Hernandez v. State*, 726 S.W.2d 53 (Tex.Crim.App.1986). In Strickland, the Supreme Court adopted a two-pronged analysis for claims of ineffective assistance. Under the first prong, the defendant must show that counsel's performance was deficient, to the extent that counsel failed to function as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Under the second prong, the defendant must show that counsel's deficient performance prejudiced the defense. Id. To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068. Under the Strickland test, the defendant bears the burden of proving ineffective assistance. In addition, when reviewing a claim of ineffective assistance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. at 689, 104 S.Ct. at 2065.

The Strickland test applies to ineffective assistance of counsel claims in the guilt-innocence phase of all criminal trials and the punishment phase of capital cases. Craig, 825 S.W.2d 128 (Tex. Crim. App. 1992)

In *Vasquez v. State*, the defendant received ineffective assistance of counsel when counsel failed to request a jury charge on the defense of necessity. Vasquez, 830 S.W.2d 948 (Tex. Crim. App. 1992). At the end of the guilt innocence phase in the case at bar, the court charged the jury, yet, the defense failed to request a lesser included charge of murder. The test

for whether a charge on the lesser included offense provides that first the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record that would permit a jury rationally to find that if defendant is guilty, he is only guilty of the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672-3 (Tex. Crim. App. 1993).

## C.  Claim for Relief

Due to defense counsel's errors, Mr. Wilson could not have received adequate representation and as such, the outcome of the trial is surely in question, therefore, Petitioner requests this Court to reverse and remand this case for a new trial, or, alternatively, a new punishment hearing.

## CLAIM FOR RELIEF

### VI.

Petitioner was Denied Effective Assistance of Counsel on Appeal when the Conduct Fell Below an Objective Standard of Reasonableness in such a way as to Undermine Confidence in the Outcome of the Appeal in Violation of the Sixth Amendment to the U.S. Constitution.

### A.  Factual Background

Appellate counsel briefed many issues to present to the Texas Court of Criminal Appeals on direct review, however, he failed to adequately brief other issues which raise serious concerns regarding the constitutionality of parole instructions coupled with the Capital Sentencing scheme, the unconstitutionality of the Texas Capital Murder statute, illegally seized evidence, improper use of peremptory challenges by the state, and trial counsels' performance at guilt/innocence as well as punishment.

### B.  Argument & Authorities

Petitioner, by way of reference, incorporates Claims I-V into claim VI.

The Defendant has a right to effective assistance of counsel on his first appeal. *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed. 2d 821 (1985).  Appellate counsel's failure to raise these issues caused procedural problems in the future.

### C.  Request for Relief.

Due to Petitioner's ineffective appellate counsel, Mr. Wilson request that this case be reversed and remanded for a new trial, or, alternatively, a new punishment hearing.

**PRAYER FOR RELIEF**

WHEREFORE, the petitioner, Marvin Lee Wilson, prays that this Court:

1.  Grant the relief requested above;

2.  Issue a writ of habeas corpus discharging the petitioner from his unconstitutional confinement and restraint and/or relieving him of his unconstitutional sentence of death in accordance with the various requests for relief set forth above; and

3.  Grant petitioner such other and further relief as this Court may deem be necessary and appropriate.

Dated October 11, 2001.

Respectfully submitted,
Law Office of James A. DeLee
2300 Memorial Blvd.
Port Arthur, Texas 77640
(409) 983-3234 office
(409) 983-5906 fax.

BY: JAMES A. DELEE
TBN:  05650500
ATTORNEY FOR PETITIONER

## CERTIFICATE OF SERVICE

JAMES A. DELEE,   being first duly sworn, deposes and says that on the 11th day of October 2001, he served the following documents:  (1) Petition and Brief for Writ of Habeas Corpus with Appendices upon attorneys for the Respondent, State of Texas, by placing a true and correct copy thereof in an envelope addressed as follows:  Ms. Amy Wilson Asst. Atty. General, Capitol Litigation Division, Office of the Texas Attorney General, P.O. Box 12548, Capital Station, Austin, Texas 78711; and upon the Petitioner, Marvin Lee Wilson, Terrell Unit, T.D.C.J.--I.D. #999098,   12002 FM 350 South, Blanchard, Texas 77351, and by depositing same, with postage prepaid, certified, return receipt requested, in the United States mails at Port Arthur, Texas 77640.

JAMES A. DELEE