IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

FILED - CLERK
U.S. DISTRICT COURT

02 FEB 11 AM 9: 36

TX EASTERN - BEAUMONT

BY_____

| | | |
|---|---|---|
| MARVIN LEE WILSON, | § | |
| Petitioner | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 6:01-CV-0186 |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division,[1] | § | |
| Respondent, | § | |

## RESPONDENT COCKRELL'S
## ORIGINAL ANSWER AND MOTION FOR SUMMARY JUDGMENT
## WITH BRIEF IN SUPPORT

Petitioner, Marvin Lee Wilson, was convicted by a jury and sentenced to death in a Texas

court for the murder of Jerry Williams during the course of a kidnapping. He now challenges the

validity of his conviction and sentence in this Court pursuant to 28 U.S.C. § 2254. However, Wilson

has failed to demonstrate that he is entitled to federal habeas corpus relief. Respondent Cockrell

(hereinafter "the Director") denies all allegations of fact made by Wilson, except those supported

by the record and those specifically admitted herein.[2]

### PETITIONER'S ALLEGATIONS

In this federal habeas proceeding, Wilson alleges six distinct constitutional violations and

asks this Court to grant the relief requested, issue a writ of habeas corpus discharging him from

---

[1]     The previous respondent in this action was Gary L. Johnson. On August 1, 2001, Janie Cockrell succeeded Johnson as Director of the Texas Department of Criminal Justice, Institutional Division. Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, she is "automatically substituted as a party."

[2]     Copies of Wilson's state trial, direct appeal, and habeas corpus records were forwarded to this Court on February 5, 2002.



confinement or relieving him of the sentence of death, and for such further relief as this court deems

necessary and appropriate. Specifically, the Director understands Wilson to raise the following

grounds for federal relief:

1. The trial court violated Wilson's rights under the Eighth and Fourteenth Amendments by failing to instruct the jury that, if sentenced to life for capital murder, Wilson must serve a minimum of 35[3] years before he would be eligible for parole. (Ground One)

2. Texas' statutory definition of "kidnapping" contained in the Texas capital murder statute is unconstitutionally vague and overbroad such that Wilson's conviction for capital murder during the course of a kidnapping violates the Eighth and Fourteenth Amendments. (Ground Two)

3. The State violated Wilson's rights under the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment by striking jurors based on race in violation of *Batson v. Kentucky*. (Ground Three)

4. The State violated Wilson's right to be free from unreasonable search and seizure under the Fourth Amendment by introducing evidence seized pursuant to an allegedly invalid search warrant. (Ground Four)

5. Defense counsel violated Wilson's right to effective assistance of counsel under the Sixth Amendment by

   a. failing to gather probable cause affidavits that were a matter of public record;
   b. failing to request a charge on a lesser included offense;
   c. improperly pressuring a material witness to change his story; and
   d. performing an in-court comparison of the physical attributes of Wilson and a witness. (Ground Five)

6. Appellate counsel violated Wilson's right to effective assistance of appellate counsel under the Sixth Amendment by failing to raise grounds one through five above on direct appeal. (Ground Six)

---

[3]The sentencing statute in effect at the time of Wilson's offense provided, in relevant part: "(2) If a prisoner is serving a life sentence for a capital felony, the prisoner is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good conduct time, equals 35 calendar years." TEX. CODE CRIM. PROC. ANN. art. 42.18 § 8(b)(2) (Vernon 1992).

However, as discussed more fully below, all six requests for relief must fail. Specifically, grounds one, three, four and five of petitioner's claim were procedurally defaulted. Moreover, all of petitioner's claims are foreclosed under the AEDPA by reasonable state court findings. Because petitioner failed to demonstrate that the state court's adjudication was either contrary to, or involved an objectively unreasonable application of, clearly established federal law as determined by the Supreme Court, federal habeas corpus relief should be denied.

## STATEMENT OF THE CASE

In April of 1994, Wilson was tried, convicted and sentenced to death for the murder of Jerry Williams during the course of kidnapping. Wilson's conviction and sentence were automatically appealed to the Court of Criminal Appeals of Texas, which reversed and remanded the case for a new trial. *Wilson v. State*, 938 S.W.2d 57 (Tex. Crim. App. 1997). In January and February of 1998, Wilson was tried, convicted and sentenced to death a second time. Tr 291 (verdict); Tr 296-99 (sentence).[4] Wilson's conviction and sentence were again automatically appealed to the Court of Criminal Appeals of Texas, which affirmed on December 8, 1999. *Wilson v. State*, 7 S.W.3d 136 (Tex. Crim. App. 1999); Petitioner's Appendix 1. Wilson's conviction and sentence became final on March 7, 2000, when the time for filing a petition for writ of certiorari in the United States Supreme Court expired, *i.e.,* ninety (90) days after his conviction was affirmed on December 8, 1999.

---

[4]"Tr" refers to the transcript of pleadings and documents filed with the court during trial, preceded by volume number and followed by page numbers. "SR" refers to the state record of transcribed trial proceedings, preceded by volume number and followed by page numbers. "SX" refers to the State's trial exhibits, followed by exhibit number. "DX" refers to the defense's trial exhibits, followed by exhibit number. "CX" refers to the court's trial exhibits, followed by number. "SHTr" refers to the transcribed record of the state evidentiary hearing, preceded by volume number and followed by page number.

Following his direct appeal, Wilson filed a state application for writ of habeas corpus with the trial court on December 27, 1999.[5]  1 SHTr 60; Petitioner's Appendix Vol. 2, Exh. 6.  The trial court filed detailed findings of fact and conclusions of law recommending that Wilson's application be denied.  1 SHTr 30-50; Petitioner's Appendix 2, Exh. 9.  On October 11, 2000, the Court of Criminal Appeals adopted the trial court's findings and conclusions and denied habeas corpus relief. *Ex parte Wilson*, No. 46,928-01 (Tex. Crim. App. October 11, 2000) *(per curiam)* (unpublished order); Petitioner's Appendix Vol. 10, Exh. 10.

Wilson filed the instant federal petition for writ of habeas corpus on October 11, 2001. *Wilson v. Cockrell*, No. 6:01-CV 186 (E.D. Tex. filed October 11, 2001).

## STATEMENT OF FACTS

### I.  Facts of the Crime

The victim, Jerry Williams, was a confidential police informant whose information enabled Officer Robert Roberts to obtain a warrant to search Wilson's apartment for narcotics on November 4, 1992.  Immediately prior to the execution of the warrant, Williams entered and left the apartment. The search netted 24 grams of cocaine and Wilson was arrested for possession of a controlled substance.  Wilson was subsequently released on bond.

Sometime after the incident, Wilson told Terry Lewis that someone had "snitched" and that the "snitch" was never going to have the chance "to have someone else busted," and that he "was going to him."  16 SR 23.

---

[5]     The state habeas application was filed in the same state court in which Wilson was convicted.  The presiding judge during both the trial and habeas proceedings was the Honorable Leonard Giblin.

On November 9, 1992, several witnesses observed Wilson accost the victim in a grocery store parking lot and threaten him. The witnesses heard Wilson ask the victim "What do you want to be a snitch for? Do you know what we do to a snitch? Do you want to die right here?" In response the victim begged for his life then made a break for safety, running from Wilson. Wilson pursued the victim, recaptured him and began to beat him. At some point during this exchange Wilson was heard to ask his accomplice "Where's the gun?" *See generally* 15 SR, 78-80, 99-101, 120, 126-29, 193-94, 201. Ultimately Wilson forced the victim into a car at gunpoint, then drove away. 15 SR 103-05, 130, 195-96. Witnesses reported hearing what they believed to be two gunshots fired approximately 10 minutes later. 15 SR 197, 205.

Following this incident, Wilson was heard telling his wife, "Baby, you remember the nigger I told you to get? I did it. I don't know if he's dead or what, but I left him there to die." 15 SR 24-25. The victim's nude body was found the following morning in a nearby field. 15 SR 16-17, 25, 32, 36-37, 41. Two spent bullet casings were found near the body. 15 SR 37, 44-45. An autopsy revealed he had died as a result of two gunshot wounds to the head. 15 SR 188.

## II.    Punishment Evidence

### A.    Evidence presented by the State

Wilson had previously been convicted of aggravated robbery twice and had previously been convicted of robbery once. 23 SR 8-9. At the time of his first armed robbery, he was old enough that he could have worked for a living instead. 23 SR 82-83. On July 3, 1983, he robbed a convenience store clerk at gunpoint. 23 SR 63-68. Wilson had a bad reputation in the community and was neither peaceable nor law-abiding. 23 SR 9-10, 19-20, 26, 31.

5

Royce Smithey, chief investigator for the special prosecution unit which investigates felonies committed inside the Texas Department of Corrections, testified as to at least four instances where a capital murderer who had been sentenced to life had committed another murder in prison, and to the existence of numerous other instances where such individuals committed other serious felonies (24 SR 54-55) or attempted to escape (24 SR 58-59).

**B.      Evidence presented by the Defense**

Wilson cooperated with police, and even permitted them to search his car, when he was stopped while driving. 23 SR 16. Wilson did not cause any particular problems for police when they twice searched his house pursuant to warrants (23 SR 21- 22, 43) and police found no weapons when they searched (23 SR 53-54). Wilson did not act violently when he came into contact with police (23 SR 28, 33, 45) or corrections officers (23 SR 97) at other times, and his behavior while incarcerated included only minor disciplinary infractions none of which involved physical violence (24 SR 3-6). Wilson did not harm the convenience store clerk he robbed in July of 1983. 23 SR 69.

Wilson's mother was sickly and his father humiliated, verbally and physically abused her. 23 SR 85. Wilson also suffered physical abuse at the hands of his father who "lived a life of drinking, gambling and chasing women." 23 SR 73-75. Wilson and his five siblings often went without the basic necessities of life. 23 SR 85. After his father left, Wilson helped support his siblings by gambling, selling drugs, and stealing food. 23 SR 76. Although Wilson had not been law-abiding, he had merely done what was necessary to support himself and his siblings. 23 SR 86.

A psychiatrist testified he observed no pattern of repeated or escalating violence in Wilson's history despite the fact that Wilson used a gun to commit a robbery in 1983 and a gun to commit murder in 1992. 23 SR 106. After reviewing Wilson's history, the psychiatrist testified that "except

6

for the offense for which he's currently found guilty, he does not have a substantial, persistent or any real consistent history that supports a tendency toward predictable violence," and his age (approximately 40) would weigh heavily in that determination because the most violent people in or society are males between the ages of 19 and 26. 23 SR 108-09.

## ANSWER

### I.       Procedural Default

Wilson has procedurally defaulted his right to raise claims three (*Batson*) and four (Fourth Amendment violation) in federal habeas as a consequence of his failure to raise those issues on direct appeal, and has procedurally defaulted his right to raise claim five (ineffective assistance of trial counsel) as a consequence of his failure to plead and prove any facts to support his claim when it was presented to the state habeas court.  It is well settled that federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default.[6] *Harris v. Reed*, 489 U.S. 255, 265, 109 S. Ct. 1038, 1043 (1989); *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 2553 (1991); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995).

In *Harris,* the Supreme Court created a conclusive presumption that there is no independent state procedural ground if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not "clearly and expressly" rely on an independent state ground. *Harris v. Reed,* 489 U.S. at 261, 266, 109 S. Ct. at 1042, 1045. However, in *Coleman,* the Supreme Court

---

[6]       A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim. *Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir. 1999).

held that where the state court's denial "fairly appears" to rest primarily on state law, and does not mention federal law, the *Harris* presumption does not apply and the claim is procedurally defaulted. *Coleman v. Thompson,* 501 U.S. at 740-44, 111 S. Ct. at 2559-61.

Where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice that is attributable to the default. *Murray v. Carrier*, 477 U.S. 478, 485, 106 S. Ct. 2639, 2644 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87-88, 97 S. Ct. 2497, 2506-2507 (1977). The Supreme Court has clarified the meaning of cause and prejudice in several cases. *See Murray v. Carrier*, 477 U.S. at 487, 106 S. Ct. at 2645; *Engle v. Isaac*, 456 U.S. 107, 132-133, 102 S. Ct. 1558, 1574-1575 (1982). The Court has held that if the "basis of the constitutional claim is available, and other defense counsel have perceived and litigated that claim," a particular petitioner's lack of knowledge of the legal basis for the claim does not constitute cause for the failure to raise the claim below. *Engle*, 456 U.S. at 134, 102 S. Ct. at 1575. Generally, the test for whether a petitioner has demonstrated cause has been "whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." *Murray*, 477 U.S. at 488, 106 S. Ct. at 2645.

As discussed more fully, *infra*, the state habeas court denied relief on petitioner's third, fourth and fifth claims as a consequence of petitioner's state procedural default and his inability to show cause or prejudice. Thus, Wilson's third, fourth and fifth claims are procedurally barred from federal habeas review.

8

## II.  Standard of Review

This proceeding is governed by the provisions set forth in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (1996) ("AEDPA").[7]  Through those provisions, Congress sought to curb federal habeas corpus review of state criminal convictions. *See, e.g., (Terry) Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 1518 (2000) (acknowledging that, through AEDPA, "Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law.") (citation omitted); *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000), *cert. denied*, 121 S.Ct. 2220 (2001) ("Embodying the principles of federalism, comity, and finality of judgments, AEDPA substantially restricts the scope of federal review of state criminal court proceedings") (footnotes omitted).  Accordingly, under the standards codified in 28 U.S.C. § 2254(d), a federal application for writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in  state court proceedings unless the adjudication of the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The Fifth Circuit has interpreted this section as establishing the standards of review for each of the three different questions on which a judicial decision may rest — *i.e.*, questions of law, mixed questions of law and fact, and questions of fact. *See Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir.

---

[7]    In *Lindh v. Murphy*, the Supreme Court held that the AEDPA applies only to cases filed after the statute's enactment on April 24, 1996.  521 U.S. 320, 335, 117 S. Ct. 2059, 2067 (1997).  Wilson filed the instant petition on October 11, 2001.  Therefore, the amended provisions apply to him.

2000), *cert. denied*, 121 S. Ct. 1420 (2001) (holding that section 2254(d)(1) controlled both questions of law and mixed questions of law and fact, while section 2254(d)(2) applied to pure questions of fact); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 2001 (2001) (same).

With regard to questions of law under section 2254(d)(1), the Supreme Court has held that a state court decision is "contrary to" established federal law if that decision is "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court precedent.[8] *Williams*, 529 U.S. at 405, 120 S. Ct. at 1519 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 495 (1976)). Likewise, a state court adjudication that confronts a set of facts that are "materially indistinguishable' from a relevant Supreme Court decision, yet reaches a different result, is also "contrary" under the meaning of section 2254(d)(1). *Id.* 529 U.S. at 406, 120 S. Ct. 1519-20.

Similarly, when confronting a mixed question of law and fact under section 2254(d)(1), a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.*, 529 U.S. at 407-8, 120 S. Ct. at 1520-21. In this regard, a federal habeas court's inquiry into reasonableness should be objective rather than subjective, and a court "may not issue the writ simply because that court

---

[8]     Specifically, the Court explained that a state-court decision would be "contrary to" Supreme court precedent where the state court applied a rule that contradicted the governing law set forth in the Court's own decisions. *Williams*, 529 U.S. at 405-06, 120 S. Ct. 1519. The Court then used an example where a state court misstated the standard in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), to require a prisoner to prove by "a preponderance of the evidence" that the result of his criminal proceeding would have been different. *Id.* Because *Strickland* only requires that a prisoner demonstrate a "reasonable probability" of a different outcome, the Court noted that the state court's adjudication would be "contrary to" clearly established precedent. *Id.*

10

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.*, 529 U.S. at 411, 120 S. Ct. at 1522; *see also Santellan v. Cockrell*, 271 F.3d 190, 192 (5th Cir. 2001) (noting that "'most important point'" of *Williams* decision was that an "'incorrect application of federal law is not necessarily unreasonable'") (quoting *Williams*, 529 U.S. at 411-12, 120 S. Ct. at 1522-23). Moreover, the Fifth Circuit has made clear that, when applying the "unreasonable application" test, a federal habeas court's focus should be only on the objective reasonableness of the state court's ultimate conclusion, rather than on the method by which the state court arrived at its conclusion. *See Santellan*, 271 F.3d at 193 (stating that AEDPA "compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning"). Consequently, this court cannot grant relief on any claim unless it determines that the state court's adjudication was "diametrically different" from, or involved an objectively unreasonable application of, compelling Supreme court precedent that existed at the time the conviction became final. 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 412-12, 120 S.Ct. at 1523.

With regard to questions of fact, section 2254(e)(1) requires federal courts to presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."[9] 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824 (5th Cir. 1997) (noting that AEDPA "apparently places a more onerous burden on the petitioner [than the traditional presumption of correctness afforded state court factual findings] in that the petitioner must now rebut the presumption of correctness by clear and convincing

---

[9]     *See also Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S. Ct. 843, 850 (1983) (explaining that, under pre-AEDPA standard, a federal habeas court was required to "conclude that the state court's findings lacked even 'fair [] support' in the record" before rejecting those findings).

11

evidence"). Further, except for the narrow exceptions contained in section 2254(e), the evidence upon which an applicant may challenge a state court's factual findings must have been presented to the state court. Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence *presented in the state court proceeding*," 28 U.S.C. § 2254(d)(2) (emphasis added), it follows that a federal habeas petitioner may not use evidence that was not presented to the state court in an attempt to impugn that court's factual findings. *See Dowthitt v. Johnson*, 230 F.3d 733, 745-56 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 1250 (2001) (noting that new factual allegations presented in support of a previously asserted legal theory will be considered unexhausted under section 2254(b)).

**III.    Petitioner is Not Entitled to Relief under the Federal Habeas Corpus Act.**

> **A.    A jury instruction on parole eligibility under a sentence of life was not constitutionally required, and the lack of one did not violate Wilson's rights under the Eighth or Fourteenth Amendments. (Ground 1)**

Petitioner asserts that his right to due process under the Eighth and Fourteenth Amendments was violated by the trial court's refusal to instruct the jury that, if sentenced to life in prison, he would not be eligible for parole for 35 years. On direct appeal, the Court of Criminal Appeals denied relief on this claim stating, "We have consistently held that the United States and Texas constitutions do not require that a jury in a capital case be given such information." *Wilson v. State*, 7 S.W. 3d 136, 148 (1999) (citations omitted). The state habeas court likewise denied relief on this claim finding that it was procedurally barred. *Ex parte Wilson*, No. 46,928-01 *per curiam* (Tex. Crim. App. October 11, 2000) (adopting the trial judge's findings and conclusions at 1 SHTr 30-33). *See* Petitioner's Appendix Vol. 2. The state court's decision was neither contrary to, nor involved an

12

unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, the state court's decision is entitled to deference under the AEDPA.

Moreover, Wilson advances no novel argument which merits the granting of relief by this court. Although petitioner acknowledges that Texas law, as it existed at the time of his trial, did not permit a jury instruction regarding parole eligibility, he merely cites the dissent from the denial of certiorari in *Brown v. Texas,* 522 U.S. 940, 118 S. Ct. 355 (1997), as support for his argument that Texas law is not in accord with the Supreme Court's decision in *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187 (1994). Petition at 12-13. *Simmons* does not support petitioner's argument, and his reliance upon *Brown* to reach that decision is misplaced.

In *Simmons,* the Supreme Court reaffirmed the general rule enunciated in *California v. Ramos*, 463 U.S. 992, 103 S. Ct. 3446 (1983), that the decision whether to inform the jury of the defendant's eligibility for early release should be left to the states. 512 U.S. at 168, 114 S.Ct. at 2196 (plurality opinion); *id.* at 176 (Rehnquist, O'Connor and Kennedy, JJ., concurring in judgment). However, the Court carved out an exception to the rule where the state seeks the death penalty based, at least in part, upon the premise that the defendant will be dangerous in the future, and the alternative sentence to death is life *without* the possibility of parole. 512 U.S. at 168-69, 114 S. Ct. at 2196 (plurality opinion), *id.* at 177 (Rehnquist, O'Connor and Kennedy, JJ., concurring in judgment). The Court's concern in such a case was that, absent instruction to the contrary, the jury would assume the defendant would ultimately be eligible for parole (as is the common practice for most other crimes), and that this erroneous assumption would tip the balance unfairly in favor of the death penalty. *Id., passim.*

13

The holding of *Simmons* is irrelevant to states such as Texas where life without parole is not

a sentencing option in capital cases. *See Ramdass v. Angelone,* 530 U.S. 156, 120 S. Ct. 2113

(2000). In *Ramdass,* which post-dates the *Brown* decision upon which petitioner so heavily relies

to reach *Simmons,* the Court recognized that the plurality decision in *Simmons* requires that a

defendant be allowed to inform the jury of parole ineligibility in cases where future dangerousness

is at issue. *Ramdass,* 530 U.S. at 165, 120 S. Ct. at 2119.  However, the Court reaffirmed the

principle that states maintain some discretion in determining the extent to which juries should be

advised of parole status, and specifically stated that "[the Court has] not extended *Simmons* to cases

where parole ineligibility has not been established as a matter of state law at the time of the jury's

future dangerousness deliberations in a capital case." *Id.*  Rather, "*Simmons* applies only to

instances where, as a legal matter, there is *no possibility* of parole if the jury decides the appropriate

sentence is life in prison." *Id.* at 169, 120 S. Ct. at 2121 (emphasis added).

The clarity of the Supreme Court's *Ramdass* opinion notwithstanding, petitioner nevertheless

asks this court to "reconsider" precedent from the Texas Court of Criminal Appeals "in light of the

great similarity between the facts of [this] case and *Simmons*," arguing that "but for the refused jury

instruction" he "could have received a life sentence rather than the death penalty." Petition at 13,

15.  This argument is without merit for two reasons: (1) Texas does not limit the future

dangerousness inquiry to a defendant's propensities for violence outside the prison, but includes his

conduct in prison, and (2) contrary to petitioner's assertion, informing the jury that he might spend

only 35 years in prison would not have strengthened petitioner's case for a life sentence as an

alternative to death. In addition, this court should reject petitioner's argument because the State has

14

a legitimate public policy interest in excluding parole eligibility information from juries in capital cases.

The concept of future dangerousness as recognized in Texas' capital-sentencing scheme, and as presented to the jury in the instant case, is distinguishable from the concept of future dangerousness argued by the South Carolina prosecutor in *Simmons*. The prosecutor in *Simmons* "urge[d] the jury to sentence the defendant to death so that he [would] not be a danger to the public if released from prison." *Simmons* 512 U.S. at 163, 114 S. Ct. at 2193. Under the Texas scheme, in contrast, a prosecutor urges a jury to answer in the affirmative a specific question, "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(b)(1). "Society" in this context includes both prison and non-prison populations, *Jones v. State*, 843 S.W.2d 487, 495 (Tex. Crim. App. 1991); *Boyd v. State*, 811 S.W.2d 105, 118 n.12 (Tex. Crim. App. 1991), such that Texas' "future dangerousness" special issue "is much more abstract than that asked in the argument urged in South Carolina [in *Simmons*]." *Smith v. State*, 898 S.W.2d 838, 852 n.19 (Tex. Crim. App. 1995). Thus, in *Allridge v. Scott*, 41 F.3d 213 (5th Cir. 1994), the Fifth Circuit held that when the state argues the defendant poses a future danger to everybody, fellow inmates included, the defendant's eligibility for parole is irrelevant. *Id.* at 222, n.12. *See also Miller v. Johnson,* 200 F.3d 274, 290-91 (5th Cir. 2000); *Muniz v. Johnson*, 132 F.3d 214, 224 (5th Cir. 1998); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1995); *Johnson v. Scott*, 68 F.3d 106, 111 (5th Cir. 1995); *Montoya v. Scott*, 65 F.3d 405, 417 (5th Cir. 1995). Because Texas juries are asked to consider a defendant's future dangerousness to inmates and employees of the prison system as well as to "free

society," a parole instruction is in no way determinative of the future dangerousness inquiry and is thus irrelevant to the issue of future dangerousness.

Moreover, such information would more likely have harmed petitioner's case for a life sentence. A parole instruction would have reminded the jury that petitioner could eventually be released. As the *Simmons* case recognizes, "a defendant who is eligible for parole is a greater threat to society than a defendant who is not." *Simmons,* 512 U.S. at 163, 114 S.Ct. at 2194. The harm of informing the jury of the defendant's parole eligibility would have been especially severe where, as here, a prospective juror specifically expressed concern that "[l]ife in prison is not life" but that it is "15, 20 years; and then they get paroled" and that such a sentence left the jury issuing a life sentence feeling "betrayed." 3 SR 125-26 (comments of Juror John Murphy). Thus, unlike *Simmons*, the mitigating value of informing the jury of his parole ineligibility for 35 years would not have served the same purpose as informing a jury of complete ineligibility. Moreover, unlike *Simmons*, if petitioner's jury had been allowed to speculate that he might be free someday, it would have been correct in doing so. *Smith v. State*, 898 S.W.2d at 851 n.19; *Jones v. State*, 843 S.W.2d at 495; *Simmons v. South Carolina*, 512 U.S. at 168 n.8, 114 S. Ct. at 2196 n.8. In short, the mitigating aspects of a life sentence that operated in the defendant's favor in *Simmons* simply do not exist in this case.

Finally, the State has a legitimate public policy interest in excluding parole eligibility information from juries in capital cases. The Supreme Court recently articulated the reason why States may choose to withhold evidence of parole eligibility from the jury:

> If the inquiry is to include whether a defendant will, at some point, be released from prison, even the age or health of a prisoner facing a long period of incarceration would seem relevant. The possibilities are many, the certainties few. If the *Simmons*

> rule is extended beyond when a defendant is, as a matter of state law, parole
> ineligible at the time of his trial, the State might well conclude that the jury would
> be distracted from the other vital issues in the case. The States are entitled to some
> latitude in this field, for the admissibility of evidence at capital sentencing was, and
> remains, an issue left to the States, subject of course to federal requirements,
> especially, as relevant here, those related to the admission of mitigating evidence.

*Ramdass,* 120 S. Ct. at 2121. Additionally, the policy behind Texas' refusal to instruct jurors is

explained in *Smith v. State*:

> While we may be sympathetic to the notion of having a jury informed of the State
> provisions for parole, such decision has been left to the legislature. We recognize,
> however, that other problems may surface if a jury were informed of the minimum
> number of years a capital defendant must serve before being eligible for parole. Our
> capital trials could quite possibly turn into mini-trials on prison space and parole
> policies and whether the legislature may in a future year reduce the minimum number
> of years prior to parole consideration. In his dissenting opinion to *California v.
> Ramos,* Justice Marshall indicated the problems with allowing juries to consider
> concepts of parole in their deliberations.

898 S.W.2d at 849 n.16 (internal citations omitted). A jury simply has no basis for assessing the

likelihood that a particular defendant will eventually be released if he is not sentenced to death. To

invite the jury to indulge in such speculation is to ask it to foretell numerous imponderables: the

policies that may be adopted by unnamed future governors and parole officials, any change in the

defendant's character, as well as any other factors that might be deemed relevant to the commutation

and parole decisions. *California v. Ramos,* 463 U.S. 992, 1020-21, 103 S.Ct. 3446, 3463 (1983)

(Marshall, J. dissenting). Judge Teague indicated another concern in his concurring opinion in

*Andrade v. State,*

> In fact, advising jurors that a life penalty is theoretically modifiable, and thus not
> 'final,' might incline them to approach their fact finding duty with less appreciation
> for the gravity of the answers to the submitted questions and for the moral
> responsibility reposed in them as fact finders. In short, such an instruction
> disclosing the Governor's power to commute a life sentence might operate to a
> defendant's severe disadvantage and to his extreme prejudice.

17

700 S.W.2d 585, 590 (Tex. Crim. App.1985) (Teague, J. concurring). 898 S.W.2d at 849-50, n. 16. Thus, Texas' reasons for not allowing jury consideration of parole eligibility are justified, and do not result in a due process violation.

In short, when determining whether *Simmons* is applicable, the critical inquiry is simply whether the defendant was "ineligible for parole as a matter of state law at the time of his sentencing trial." *Ramdass,* 120 S. Ct. at 2120-21 (case must be parallel to *Simmons* on this critical point). Here, petitioner would not only have been eligible for parole, but he would have been eligible for parole relatively quickly given the serious nature of his offense. *Simmons* simply does not apply.

Because *Allridge v. Scott*, 41 F.3d 213 (5th Cir. 1994), clearly holds that due process is not violated by the trial court's refusal to allow jury instruction on parole eligibility under the instant facts, and because petitioner fails to offer a compelling argument for overcoming this precedent, this court should reject petitioner's claim on ground one.

**B.    The statutory definition of "kidnapping" contained in the Texas capital murder statute genuinely narrows the class of persons eligible for the death penalty. (Ground Two)**

In his second ground for relief, Wilson argues the statutory definition of "kidnapping" is vague and overbroad such that his capital conviction for murder during the course of a kidnapping violates the Eighth and Fourteenth Amendments. More specifically, Wilson argues the statutory definition of "kidnapping" which provides:

> Kidnapping. A person commits the offense of kidnapping if he intentionally or knowingly abducts another person.
> Abduct means to restrain a person with intent to prevent his liberation by, A, secreting or holding him in a place where he is not likely to be found or, B, using or threatening to use deadly force.
> Restrain means restrict a person's movement without consent so as to interfere substantially with his liberty by moving him from one place to another or

18

> by confining him. Restraint is without consent if it is accomplished by force, intimidation or deception.

(22 Tr 53-54) ostensibly applies to every murder in violation of United States Supreme Court jurisprudence which holds that a state's capital sentencing scheme must narrow the class of persons eligible for the death penalty and that an aggravating circumstance which applies to every murder is constitutionally infirm. Petition at 18. Further, and in regard to the facts of his own case, petitioner argues that the statutory definition of kidnapping raises the question whether the 10-minute detention of the victim constituted kidnapping or was merely an incident to the victim's murder—in the former instance Wilson would be death eligible, in the latter he would not. Petition at 17.

### 1.     Petitioner's claim is foreclosed by the AEDPA.

Petitioner's claim under the Eighth and Fourteenth Amendments is foreclosed by the state habeas court's findings of facts which are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). The state habeas court found, *inter alia*, that

> [Wilson] has failed to show the existence of any facts which would materially distinguish the facts showing the "kidnapping" in his case from the facts showing the "kidnapping" in *Jurek v. State*, 522 S.W.2d 934 (Tex. Crim. App. 1975), the case in which the Supreme Court on certiorari held that the present Texas capital murder scheme passed constitutional muster. *See Jurek v. Texas*, 428 U.S. 269 (1976).

*Ex parte Wilson*, No. 46, 928-01 (Tex. Crim. App. Oct. 11, 1999) (adopting the findings and conclusions of the trial court at 1 SHTr 30, 34-35 ¶ 2).    *See* Petitioner's Appendix Vol. 2. Accordingly, the state habeas court held that Wilson had failed to show that the statute was unconstitutional as it applied to him. *Ex parte Wilson*, No. 46,928-01 *per curiam* (Tex. Crim. App. October 11, 2000) (adopting the trial judge's findings and conclusions at 1 SHTr 30, 36 ¶ 2, and 117-18). *See* Petitioner's Appendix Vol. 2.

19

The state court's decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. In *Jurek v. Texas*, 428 U.S. 269 (1976), petitioner approached the victim in a public place, transported her in a pickup truck to a river, choked her and threw her body in the river. Likewise, here, petitioner accosted the victim in a public place, transported him in a car to a nearby field, and shot him twice n the head. Accordingly, the state court's decision is entitled to deference under the AEDPA.

### 2. Petitioner lacks standing to raise this claim.

Regardless of the AEDPA, petitioner lacks standing to raise this constitutional claim. Although petitioner acknowledges that "it is incumbent upon [him] to show that in its operation the statute is unconstitutional as to him in his situation; that it may be unconstitutional as to others is not sufficient" (Petition at 19), petitioner fails to meet this burden. Rather, petitioner regurgigates arguments already rejected by the state habeas court (*compare* Petition at 17-19 *with* State Habeas Petition at 17-19), recites hypothetical situations (*see* Petition at 20), provides a laundry list of Texas cases addressing the sufficiency of evidence for a kidnapping conviction (Petition at 21-22), and asks that this court "review these facts and precedents and following such review" order relief. The numerous state court sufficiency of the evidence cases cited by petitioner are of questionable value to Wilson's constitutional challenge here. A determination that the evidence of a particular case is sufficient to support a kidnapping conviction still begs the question of whether that kidnapping was "incident to" the victim's murder. However, to the extent those cases provide some guidance, they establish that petitioner lacks standing to raise this constitutional claim.

In support of his argument, petitioner relies primarily upon *Hines v. State*, 40 S.W.3d 705 (2001). In *Hines*, the Texas Court of Criminal Appeals held that the "interfere substantially" element

20

of kidnapping requires more than temporary confinement or slight movement which is part and

parcel of the commission or attempted commission of another substantive criminal offense. The

court reasoned that to hold otherwise would be to bootstrap several murders into capital murder.

*Hines*, 40 S.W.2d at 713 & n. 7. Contrary to petitioner's assertion, the evidence in the instant case

satisfies the *Hines* requirement and in so doing deprives petitioner of standing to raise the instant

constitutional claim.

Several eyewitnesses testified that petitioner accosted the victim in a grocery store parking

lot and began beating him. The victim escaped momentarily, but was pursued by petitioner across

the street, recaptured, and forced (despite desperate resistance) into a car which then departed the

scene. At that point the victim was still fully clothed and very much alive. The victim's body was

found some distance away and stripped naked. From this evidence, it could reasonably be concluded

that the kidnapping was more than merely incidental to the murder, but was accomplished in order

to control the victim and, *e.g.*, torture, terrorize, humiliate or molest him. *See Santellan v. State*, 271

F.3d 190 (5th Cir. 2001) (bizarre treatment of victim evincing desire to possess or control her

sufficient to support murder in the course of attempted kidnapping conviction). It is not necessary

that this court find to its own satisfaction that Wilson intended to restrain the victim by force for

some purpose other than to murder him. It is enough to find that the jury could have reasonably

reached this conclusion based upon the evidence. *See, e.g., Brimage v. State*, 918 S.W.2d 466, 476

(1996); *Santellan*, 271 F.3d at 194 (focus is on what inferences could have been drawn by any

rational jury).

Because the evidence supports a finding of more than temporary confinement or slight

movement which was part and parcel of the commission of the murder, the *Hines* requirement is

21

satisfied and petitioner's argument that the alleged 10-minute detention of the victim was merely incidental to his murder fails. Because petitioner cannot show the statute is unconstitutional as it applies to him, he lacks standing to raise the issue here.

### 3. Texas' capital offense of murder in the course of a kidnapping is not unconstitutionally vague or overbroad.

Regardless of the AEDPA and petitioner's lack of standing, his claim is meritless. A capital sentencing scheme satisfies the Eighth and Fourteenth Amendments if it directs and limits the sentencer's discretion so as to minimize the risk of wholly arbitrary and capricious action. *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990). Thus, the sentencer must find at least one statutory aggravating circumstance that genuinely narrows the class of persons eligible for the death penalty. A statutory aggravating circumstance is void for vagueness if it does not adequately inform the sentencer of facts that must be found before the death penalty can be imposed, and it is overbroad if it requires the sentencer to find facts that are present in virtually all murder cases. *Arave v. Creech*, 1507 U.S. 463, 473-74 (1993).

Kidnapping is not a fact present in virtually all murder cases. This is easily proved by recent crime statistics. In 2000, there were 1,236 murders in Texas. Though exact statistics regarding the number of those murders committed during the course of a kidnappng are not readily available, it is clear that the number was something less than 6.15 percent of the total. *See Crime in Texas 2000*, Texas Department of Public Safety, at 19-21, located in Appendix A. (76 murders committed in the course of a felony other than those listed; the list not including kidnapping). Thus, contrary to petitioner's assertion, the Texas murder during the course of a kidnapping statute does not hold

22

"every" act of confinement or movement committed in the course of a murder sufficient to merit capital punishment.

Petitioner nevertheless contends that "many criminals could, by moving the victim the slightest distance be subject to capital punishment." Petitioner even goes so far as to argue that, "In fact, the only murders that would not be subjected to capital punishment under this interpretation would be those in which the defendant walked up and shot the victim as he was found. If the defendant so much as told the victim to stand, he could be convicted o capital murder." Petition at 20. This argument is equally without merit as the definition of kidnapping provided to juries in Texas capital cases specifically provides that the offender must "interfere substantially" with the victim's liberty. "Slight" movement of the victim is not "substantial" interference. Moreover, as previously noted, *Jurek v. State*, 522 S.W.2d 934 (Tex. Crim. App. 1975), was also a murder-in-the-course-of-kidnapping case. On certiorari review of that case, the United Sates Supreme Court held that the Texas capital murder scheme passed constitutional muster. *See Jurek v. Texas*, 428 U.S. 269 (1976).

Because the state court's decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, it is entitled to deference under the AEDPA. Alternatively, Wilson's claim fails on the merits. Accordingly, federal habeas corpus relief should be denied.

**C.    The State did not strike jurors based on race in violation of *Batson v. Kentucky*. (Ground Three)**

In his third ground for relief, petitioner asserts that the State violated his rights under the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment by striking jurors

23

based on race in violation of *Batson v. Kentucky*, 476 U.S 79 (1986). In *Purkett v. Elem*, 514 U.S. 765 (1995), the United States Supreme Court delineated the three-step process for analyzing a *Batson* claim. Step one: The opponent of a peremptory challenge must make a prima facie case of racial discrimination. Step two: The proponent must respond with a race-neutral explanation. Step three: The trial court decides whether the opponent of the strike has proved purposeful racial discrimination. *Purkett v. Elem*, 514 U.S. 765, 767 (1995). Petitioner argues that Step 3 of the *Batson* analysis reveals that the State's reasons for striking seven potential jurors of Africa-American ethnicity were merely a pretext for racially motivated peremptory challenge. Petition at 28-31. Petitioner's claim is barred as a consequence of his procedural default, foreclosed by the AEDPA, and otherwise without merit.

### 1.    Petitioner has procedurally defaulted this claim.

As an initial matter, petitioner's *Batson* claim is procedurally barred as a consequence of his failure to raise the issue on direct appeal. Petitioner raised a *Batson* challenge during jury voir dire (12 SR 10-11), but failed to raise and litigate the matter on direct appeal. The state habeas court denied relief on petitioner's claim stating, "consideration of this 'record-based' claim is procedurally barred due to [Wilson's] failure to pursue it in direct appeal of this case. Due to such failure, [Wilson] has procedurally defaulted ay right to now have it heard on collateral habeas corpus review." 1 SHTr 43; Petitioner's Appendix Vol. 2, Exh. 9. In reaching this decision, the state habeas court relied upon *Ex parte Gardner*, 959 S.W.2d 189 (Tex. Crim. App. 1998); and *Ex parte Kirby*, 492 S.W.2d 579 (Tex. Crim. App. 1973). Because, the state court's denial of Wilson's claim "fairly appears" to rest on a procedural bar arising out of state case law, independent of his federal

constitutional claims, this court is precluded from considering the claim absent a showing of cause and prejudice.

Petitioner has failed to show "cause" for not adequately briefing this claim in his direct appeal. Further, the record does not reflect an "external impediment" that may have prevented Wilson from adequately briefing these claims in a direct appeal following his original trial, as the factual bases of the claim was available at that time. Wilson was obviously aware of the facts of this claim since the time of the jury selection in this trial in 1998. Therefore, the factual and legal bases of his claim were available to Wilson since the time of his state trial proceeding. For these reasons, Wilson fails to meet the "cause" standard for default set forth in *Murray* or *Fearance*. Moreover, since Wilson lacks "cause" for failing to raise the instant claims in his direct appeal, this court need not consider whether he would be prejudiced by his inability to raise the alleged claims at this late date. *McCleskey v. Zant*, 499 U.S. 467, 501, 111 S. Ct. 1454, 1474 (1991) (citing *Murray*, 477 U.S. at 494, 106 S. Ct. at 2649 (rejecting proposition that showing of prejudice permits relief in the absence of cause)). Thus, petitioner's claim is procedurally barred from federal habeas review.

## 2. Petitioner's claim is foreclosed by the AEDPA.

Petitioner's claim is foreclosed by the state habeas court's findings of fact which are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). The state habeas court found, *inter alia*, that petitioner's

> paraphrasing of the prosecutor's stated reasons and the "comparison examples" from the voir dire of the seven subject black panelists who were struck by the prosecutor against the voir dire of the various panelists who were not struck by the prosecutor does not reflect the **full** content and thrust of their relevant voir dire testimony or of their demeanor in giving it.

25

1 SHTr 42-43; Petitioners Appendix Vol. 2, Exh. 9 (emphasis original). Petitioner's paraphrasing

of the State's reasons and the "comparison examples" in the instant petition are nearly identical to

those provided to the state habeas court. *Compare* Petition at 24-27 *with* State Habeas Petition at

28-30. Petitioner fails to rebut the presumption of correctness of the state habeas court's findings

by clear and convincing evidence. Accordingly, the court should deny relief on this claim.

### 3.   Petitioner has failed to carry his burden of proof under *Batson*.

Procedural default and the AEDPA aside, petitioner's claim that the State's reasons for

striking the seven African-American jurors were merely pretext for race discrimination is without

merit. The ultimate burden of persuasion regarding racial motivation for striking a potential juror

rests with, and never shifts from, the party raising the *Batson* challenge. *Purkett*, 514 U.S. at 768.

Petitioner argues that the State's reasons for striking Euraline Andrus, Tammy Ruffin,

Cynthia Robertson, Joseph Tackwood and Fay Gabriel are merely shams when considered in

combination with the State's acceptance of other jurors with the same or similar characteristics.

Petitioner further argues that the State's reasons for striking Alfred Thomas, Mary Nixon and Lois

Hayward are merely shams even when considered independent of the State's acceptance of other

jurors. Petitioner boldly and baldly asserts that "[t]he record on voir dire is void of any testimony

which would indicate that these jurors were challenged on the basis of anything but race." Petition

at 31. Petitioner's assertions aside, he fails to meet his burden of proof under *Batson*.

Regarding Euraline Andrus petitioner first contends the State violated *Batson* when it struck

her because she was "death soft," but kept Mary Mauer who was "soft hearted" and Kellie Meaux

who was "noncommital." Contrary to petitioner's assertion, Andrus, Mauer and Meaux did not have

the same or similar attitudes towards the death penalty. Euraline Andrus repeatedly expressed her

26

desire <u>not</u> to serve on a capital jury (3 SR 52, 53. 65, 66, 68), and although she believed in the death penalty she did not feel she could participate in the process (3 SR 53, 57-58), she could not answer the special issues according to the facts (3 SR 58, 60, 62, 64, 72) and when pressed to say otherwise she felt uncomfortable (3 SR 67). Mary Mauer was willing to serve if the attorneys thought she would do a good job (9 SR 54), and said she believed in the death penalty in some cases (9 SR 37) although she admitted she was "softhearted" (9 SR 55) and wasn't sure how she would react personally (9 SR 38). Nevertheless, Juror Mauer stated that if the facts proved the State's case she would have no problem answering the special issue questions accordingly. 9 SR 41-48. Kellie Meaux was nervous about being selected for jury duty but believed in capital punishment (3 SR 30) and so ultimately did not have a problem with serving (3 R 44) and could answer the special issue questions according to the facts ( 3 SR 37-38, 41-43). Accordingly, petitioner's comparison of Euraline Andrus to Mary Mauer and Kellie Meaux does not provide support for his *Batson* claim.

Regarding Euraline Andrus, petitioner further contends the State violated *Batson* when it struck her because she had two sons whom she claimed were treated unfairly by the criminal justice system, but kept John Murphy who felt betrayed by the legal system and Lisa Ann Phillips who had friends of the family in the penitentiary. Contrary to petitioner's assertion, Andrus, Murphy and Phillips did not have the same or similar attitudes towards the judicial system. John Murphy felt he had been "betrayed" by the justice system not because he (or someone he knew) had been treated unfairly, but because "[l]ife in prison is not life" but that it is really only "15, 20 years; and then they get paroled." 3 SR 125-26. Lisa Ann Phillips admitted she had friends and family in the penitentiary (6 SR 93), but unlike Andrus she expressed no open hostility towards the judicial system or the

27

prosecutors who put them there. 6 SR 68-94 *passim*. Accordingly, petitioner's comparison of Andrus to Murphy and Phillips does not provide support for his *Batson* claim.

Regarding Tammy Ruffin, petitioner contends the State violated *Batson* when it struck her because she wanted too badly to be on a jury, but kept Kellie Meaux, Robert Huckaby, Viole Willis, Jack Olivier, Clifford Tomplait, Christene Thompson and Michael McFarland, all of whom also wanted to be on the jury. Contrary to petitioner's assertion, Ruffin did not have the same or similar attitude toward her potential jury service as Meaux, Huckaby, Willis, Olivier, Tomplait, Thompson and McFarland had toward theirs. Ruffin, admitted she did not believe in the death penalty (4 SR 21), but that she wanted to get on the jury because she was a "starting paralegal" (4 SR 22, Ll 16) and she was "trying to learn certain things" (4 SR 22, Ll 17-17; 4 SR 32). Given this, a fair reading of Ruffin's voir dire testimony leaves one with the distinct impression that she was simply trying to give the "right" answers in order to be selected for service. 4 SR 20-44 *passim*. Meaux, who believed in capital punishment (3 SR 30), when asked if she "wanted" to be on the jury merely stated "I don't have a problem with being on the jury" (3 SR 44). Huckaby, who believed in the death penalty (4 SR 121) when asked whether he "really wanted to be on the jury" responded "Well, not particularly. But, I mean, I have a duty to serve. I believe in that" (4 SR 138). Willis, who believed in the death penalty (4 R 157-58), declined the opportunity to be excused from service based on his age (70), explaining "I believe it's your civic duty anytime that you're asked to serve your community that you should do so." 4 SR 159. Olivier, who believed in the death penalty ( SR 5 SR 72, 84; 26 SR 64, CX12), when asked if he wanted to be on the jury responded "Yes, sir" and explained that "I think more of us ought to try to serve on a jury instead of trying to avoid it, and I have the time and know-how to do it at this time" (5 SR 88). Tomplait, who believed in the death

penalty (7 SR 140-41), when asked by the State if he wanted to be on the jury responded "[i]f I'm needed, because I'm retired and I can be available, where some other people, it would be a – it would be a hardship on them." (7 SR 149). On defense examination, when asked if that was his only reason for wanting to be on the jury and if he had a problem with being on the jury besides that responded "[n]one whatever" explaining further that "I'm an American and we have a jury system and the jury system is made up of citizens. It's made up of me and this is my responsibility and I've always tried to be a responsible person." 7 SR 150. Thompson, who considered the death penalty to be deserved under certain circumstances (9 SR 76), when asked if she wanted to be on the jury stated somewhat equivocally, "I think so" (9 SR 102). McFarland, who believed in the death penalty (10 SR 35), when asked if he wanted to be on the jury responded "[m]ore so than not," explaining that "I've never been on one before," and that he would not take his jury service lightly because a man's life was at stake (10 SR 41-42). When questioned further on the matter by defense counsel, McFarland explained that he didn't want to participate in any kind of process that could result in the death of an individual, but that it was his civic duty and he was willing to do that. 10 SR 42. In summary, petitioner confuses Ruffin's desire to serve on the jury for her own purposes, *i.e.*, to learn, with the other potential jurors' willingness to serve in order to fulfill their civic duty. Accordingly, petitioner's comparison of Ruffin to Meaux, Huckaby, Willis, Olivier, Toplait, Thompson and McFarland does not provide support for his *Batson* claim.

Moreover, even assuming there was a similarity among the potential jurors regarding their desire to serve on the jury meriting similar treatment, the State provided two additional reasons for striking Tammy Ruffin, namely that she didn't consider aggravated robbery to be a serious crime

and that she was mentally immature. Petitioner does not even attempt to draw comparisons between Ruffin and the other jurors on these points.

Regarding Cynthia Robertson, petitioner contends the State violated *Batson* when it struck her because she was equivocal about the death penalty and because her job exposes her to fact situations that cause individuals to got to jail, but kept Lattrell Guidry whose answers on the jury form were equivocal on participating in a death penalty case and whose drug counseling clients often go to prison. Contrary to petitioner's assertion, Robertson and Guidry did not have the same or similar attitudes towards the death penalty or similar attitudes towards the potential incarceration of work contacts. Robertson stated she believed in the death penalty she just did not want to be any part of it. 5 SR 44-45, 51, 66. Guidry stated she believed in the death penalty and though she initially felt she didn't want to be a part of it, she had since decided she could participate. 3 SR 4-5. Robertson expressed concern over being involved in the trial because she worked inside the prison system and came into regular contact with multiple offenders. 5 SR 44-45. Thus, Robertson's attitude was borne partly of her expressed opinion that all convicts were liars. Guidry's biggest concern seemed to be with the time it would take away from her work as a drug counselor. 3 SR 25-26. Accordingly, petitioner's comparison of Robertson to Guidry does not provide support for his *Batson* claim.

Petitioner further contends the State violated *Batson* when it struck Cynthia Robertson because she did not know the trial was a two-part system, but kept Lattrell Guidry and Dianna Kasper who did not know it either. Contrary to petitioner's assertion, Robertson did not have the same level of understanding regarding the trial process as Guidry and Kasper. After having been questioned by both the State and defense counsel about her ability to find the defendant guilty (or

not guilty) based upon a reasonable doubt standard, and then being questioned about her ability to answer each of the special issue questions, Robertson still exhibited a failure to understand the two-step process. When asked, "Now, you understand that the defendant never has a burden of proof. Did you know that?" she responded "No" and admitted she would like to hear from the defendant. 5 SR 64-65. Guidry understood the process almost immediately. (3 SR 10, Ll 9; 3 SR 22-23). Kasper was not entirely clear on the two-step trial process at the start of her individual voir dire (10 SR 71), but when it was explained to her she appeared to understand how the system worked (10 SR 71-77 *passim*) and in the end said that she would not expect the defendant to testify at any point (10 SR 77-78). Accordingly, petitioner's comparison of Robertson to Guidry and Kasper does not provide support for her *Batson* claim.

Regarding Joseph Tackwood, petitioner contends the State violated *Batson* when it struck him because he couldn't understand the difference between guilt beyond a reasonable doubt and guilt beyond all doubt, he wore dark glasses and he had never thought about serving on the jury, but kept jurors Xuan Duong and Viole Willis who both stated they would hold the State to a higher burden of proof than proof beyond a reasonable doubt. Duong expressed some confusion about the standard of proof (4 SR 46-48) borne of a small language barrier (4 SR 59-60), but in the end agreed that he would follow the law and apply reason and common sense to the facts in determining whether the State's case was true or not (4 SR 49, 61-62), and also that he could answer each one of the special issue questions according to the facts (4 SR 59, 63-65). Willis also expressed some concern over the State's burden of proof (4 SR 162-63), but following a lengthy explanation by the State and some discussion it became apparent that Willis's alleged higher burden of proof was simply that he would consider the matter more seriously than he might a lesser offense in light of the severity of

31

the penalty at stake and that he was simply unable to express this view in legalistic terms (4 SR 164-66, *see also* 4 SR 176, 177, 178). Unlike Duong, Tackwood suffered from no apparent language barrier yet was unable to discern any difference between "strongly believed," "likely," "probably," "possibly," and "beyond a shadow of a doubt." 9 SR 60-62. Further, he unequivocally stated that he believed the State's burden of proof in a death penalty case ought to be higher than the beyond a reasonable doubt standard. 9 SR 63. And unlike Willis, a fair reading of Tackwood's testimony as a whole indicates that this statement cannot reasonably be attributed to Tackwood's personal desire to consider the matter more carefully in light of the severity of the potential punishment. In this regard, the court should consider not only Tackwood's clip-bordering-on-abrasive "Yes, sir"–"No, sir" answers (9 SR 59-72 *passim*), but also the State's observations that Tackwood failed to even consider the seriousness of the task he was being asked to undertake, and the apparent disrespect for the court and the parties he exhibited by wearing unnecessarily dark glasses in the courtroom. If ever there was a case where a reviewing court should defer to the decision of the trial court which heard the witnesses and observed their demeanor in the courtroom, this is certainly it. Accordingly, petitioner's comparison of Tackwood to Duong and Willis does not provide support for his *Batson* claim.

Regarding Fay Gabriel, petitioner contends the State violated *Batson* when it struck her because she was on a hung jury, but kept Dianna Kasper who was also on a hung jury. Contrary to petitioner's assertion, Gabriel and Kasper did not have the same or similar attitudes towards their former jury service. Gabriel took great pride in the fact that she "held out" and hung the jury in her prior case so that a mistrial had to be declared. 10 SR 53. In contrast, Kasper did not claim to be the vote that hung the jury in her prior case and did not express any particular pride in having been on

32

a hung jury. Rather, Kasper merely stated that her prior jury service had been a "good experience." 10 SR 71. Accordingly, petitioner's comparison of Gabriel to Kasper does not provide support for his *Batson* claim.

Regarding the remaining three potential jurors at issue, the State struck Juror No. 22, Alfred Thomas, because he did not believe in the death penalty, he knew the defendant's wife and believed her to be a truth teller, and the State expected her to testify because she testified in petitioner's first trial. 12 SR 14. The State struck Juror No. 23, Mary Nixon, because she refused to tell anybody where her husband worked, was combative and abrupt with both sides and because her combative attitude was not conducive to working with 11 people. The State also struck Mary Nixon because her answers regarding her attitudes towards the second special issue made her a desirable juror for the defense, and as a result an undesirable juror for the State. 12 SR 14-15. The State struck Juror No. 41, Lois Hayward, for medical reasons. 12 SR 15. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). Moral concerns about the death penalty, a potential juror's personal knowledge of witnesses, uncooperative behavior and bad attitude, and medical problems are all perfectly legitimate reasons to strike a potential juror. *See United States v. Webster*, 162 F.3d 308, 349 (5th Cir. 1999), *Wyle v. State*, 836 S.W.2d 796 (1992) (fear that potential jurors would be unable to recommend a death sentence when the time came sufficient); *Jones v. State*, 902 S.W.2d 102 (5th Cir. 1995) (knowledge of prosecutor and witnesses sufficient); *United States v. Mixon*, 977 F.2d 921, 923 (5th Cir.1992) (animosity toward prosecution sufficient); *Puckett v. State*, 788 So.2d 752 (5th Cir. 2001), *Williams v. State*, 804 S.W.2d 95 (1991) (medical problems sufficient). Indeed, nothing about the State's explanations for striking Alfred Thomas, Mary Nixon or Lois Hayward reveals any

33

inherent racially discriminatory intent and petitioner makes no specific argument to overcome the resulting presumption that the State's reasons for striking them were, indeed, race neutral.

If the court has yet to be convinced no *Batson* violation occurred, it should further take note that there were 43 prospective jurors on the panel. Petitioner fails to show (and the record does not reflect) how many of those 43 prospective jurors were African-American. The State's peremptory strikes were fairly evenly split between African-Americans (7) and Caucasians (8). Petitioner also fails to show (and the record does not reflect), the racial composition of the jury selected from the prospective jury panel. Nothing about this data (or lack of data) even remotely suggests the State was targeting African-Americans for removal from the jury panel based solely on race.

Because the ultimate burden of persuasion regarding racial motivation for striking a potential juror rests with, and never shifts from, the party raising the *Batson* challenge, and because petitioner fails to meet this burden, habeas relief should be denied.

**D.     The State did not violate Wilson's due process rights under the Fourth Amendment because the warrants were valid and because the evidence seized thereby was not material to his guilt of the capital murder charge. (Ground Four)**

In his fourth ground for relief, petitioner asserts that the State violated his right to due process under the Fourth Amendment by introducing evidence seized under two allegedly invalid search warrants. Petitioner's claim is barred by *Stone v. Powell*, procedurally barred, foreclosed by the AEDPA and otherwise lacks merit.

**1.     This claim is barred by *Stone v. Powell*.**

A claim of Fourth Amendment error based on an allegedly unconstitutional search and seizure is not cognizable on federal habeas corpus review when the state has provided an opportunity

for full and fair litigation of the claim. *Stone v. Powell*, 428 U.S. 265 (1976). Petitioner's claim would have been cognizable on direct appeal, but he failed to raise it. In light of petitioner's failure to take advantage of available avenues of review, he cannot show that he was deprived of the opportunity for full and fair litigation of his claim. *See Caver v. Alabama*, 577 F.2d 1188, 1192-93 (5th Cir. 1978) (existence of state processes for full and fair litigation, not defendant's use of those processes, serves the policies underlying the exclusionary rule and bars federal habeas corpus consideration of claims). Therefore, *Stone* bars federal review of the claim.

### 2.    Petitioner has procedurally defaulted this claim

Petitioner's due process claim under the Fourth Amendment is procedurally barred as a consequence of his failure to raise the issue on direct appeal. Petitioner objected to the admission of evidence seized pursuant to the warrants at trial, but failed to raise and litigate the matter on direct appeal. The state habeas court denied relief on petitioner's claim stating, "Due to [Wilson's] failure to raise and litigate this 'record-based' claim on direct appeal, he has procedurally defaulted any right to have it considered in this collateral post conviction habeas corpus proceeding." 1 SHTr 39; Petitioner's Appendix Vol. 2, Exh. 9. In reaching this decision, the state habeas court relied upon *Ex parte Garner*, 959 S.W.2d 189 (Tex. Crim. App. 1998); *Ex parte Rojas*, 981 S.W.2d 690 (Tex. Crim. App. 1998) (Baird, Judge, concurring), and *Ex parte Kirby*, 492 S.W.2d 579 (Tex. Crim. App. 1973). Because the state court's denial of Wilson's claim "fairly appears" to rest on a procedural bar arising out of state case law, independent of his federal constitutional claims, this court is precluded from considering the claim absent a showing of cause and prejudice.

Wilson has failed to show "cause" for not adequately briefing this claim in his direct appeal. Further, the record does not reflect an "external impediment" that may have prevented Wilson from

adequately briefing these claims in a direct appeal following his original trial, as the factual bases of the claim was available at that time. Wilson was obviously aware of the facts of this claim since the time of his first trial proceedings in 1994. Therefore, the factual and legal bases of his claim were available to Wilson since the time of his first state trial proceeding. For these reasons, Wilson fails to meet the "cause" standard for default set forth in *Murray* or *Fearance*. Moreover, since Wilson lacks "cause" for failing to raise the instant claims in his direct appeal, this court need not consider whether he would be prejudiced by his inability to raise the alleged claims at this late date. *McCleskey v. Zant*, 499 U.S. 467, 501, 111 S. Ct. 1454, 1474 (1991) (citing *Murray*, 477 U.S. at 494 (rejecting proposition that showing of prejudice permits relief in the absence of cause)). Thus, Wilson's claim is procedurally barred from federal habeas review.

### 3. Petitioner's claim is foreclosed by the AEDPA.

In addition, petitioner's claim is foreclosed by the AEDPA as a consequence of the state habeas court's denial of relief on the merits. On state habeas review, the court alternatively denied relief on the merits stating:

> 2. * * * [Wilson] has failed to demonstrate that the subject search warrants were invalid; and he has further failed to show that any evidence material to his guilt of the capital murder charge was seized at either of the two searches. * * *
>
> 3. In the alternative, even if, *arguendo*, this [c]laim were entitled to consideration and found to have merit, [Wilson] would still not be entitled to relief in this habeas corpus proceeding because he has failed to allege and **prove** by a preponderance of the evidence that any illegality in the searches did **in fact** contribute to his conviction.

1 SHTr 39; Petitioner's Appendix Vol. 2, Exh. 9 (citations omitted) (emphasis original). In his federal habeas petition, Wilson again merely regurgitates, word-for-word, the argument already rejected by the state habeas court. *Compare* Petition at 32-37 *with* State Habeas Petition at 22-27.

36

Because petitioner failed to demonstrate that the state court's adjudication was either contrary to, or involved an objectively unreasonable application of, clearly established federal law as determined by the Supreme Court, federal habeas corpus relief should be denied.

### 4. Petitioner's claim fails on the merits.

State and federal procedural bars aside, petitioner's Fourth Amendment due process claim fails on the merits. The affidavits supporting both the April 9, 1992, and the November 4, 1992, search warrants state, in relevant part:

> 1. THERE IS IN JEFFERSON COUNTY, TEXAS, A SUSPECTED PLACE AND PREMISES DESCRIBED AND LOCATED AS FOLLOWS: A beige wood framed apartment building, located in the 2100 block of Brickyard in the city limits of Beaumont, Jefferson County, Texas. Said suspected place is located on the North side of Brickyard and the apartment doors face West. The South side of the apartment face Brickyard and the numbers 2190 are displayed on the left corner of that side. Suspected apartment is the second apartment as you walk North from Brickyard on the west side of the building. Search warrant shall include all out building and vehicles under the control of the occupants.

> \* \* \* \*

> 5. AFFIANT HAS PROBABLE CAUSE FOR SAID BELIEF BY REASON OF THE FOLLOWING FACTS:
> \* \* \* \*
> Affiant [Officer Robert E. Roberts] has a confidential and reliable informant hose name and identity must remain a secret due to the reasons of personal safety and security. Affiant knows said informant to be reliable due to the fact that over the past ten [twenty][10] months said informant has given Affiant information on at least twenty [sixty][11] occasions in reference to persons selling and using narcotics. Said informant has proven true and correct on each and every occasion by means of

---

[10]     The April 9, 1992, affidavit said "ten" months, the November 4, 1992, affidavit said "twenty" months.

[11]     The April 9, 1992, affidavit said "twenty" occasions, the November 4, 1992, affidavit said "sixty" occasions.

surveillance, investigation, and other independent informants. Said information has led to the arrest of at least sixteen [eighteen][12] persons for narcotics violations.

On this date Affiant was contacted by said informant who stated that he/she had been inside the described suspected place within the past seventy two hours and observed the described suspected persons in possession of a quantity of Cocaine. Said informant stated that the Cocaine was being secreted in different places inside the described suspected place and on the persons of the described suspected persons. Said informant also stated that the cocaine was being possessed for the purpose of sale. Said informant stated that he/she knew the substance to be cocaine from personal experience and the described suspected persons did in fact tell him/her that the substance was cocaine

26 Tr SX 33, 34; Petitioner's Appendix Vol. 2, Exh.7 . At trial, the State introduced into evidence

a measuring cup containing white residue, one "cookie" and two "rocks" of cocaine, plus a cable bill

bearing the name Marvin Wilson and the address 2192 Brickyard, all of which were seized during

the November 4, 1992 search.

Petitioner contends the "negligible reliability of the [confidential informant] shows Officer

Robert's reckless disregard for the truth" (Petition at 34-35), that the affidavits were "vague as to

time" (Petition at 35-36), "vague as to description" of the property to be seized (Petition at 36), and

invalid because of the discrepancy in street numbers (Petition at 36-37). Petitioner's arguments are

without merit.

**a.** **The confidential informant was reliable and Officer Robert did not exhibit "reckless disregard for the truth."**

Defendant cannot go behind the four corners of the affidavit in order to expose defects unless

the affidavit contains false or reckless statements. *Delaware v. Franks*, 438 U.S. 154 (1978).

Petitioner has not, and cannot, prove the affiant intentionally and knowingly included a statement

of material fact which was not true or which was made with reckless disregard for the truth.

---

[12]     The April 9, 1992, affidavit said "sixteen" eighteen, the November 4, 1992, affidavit said "eighteen" persons.

At the pre-trial suppression hearing, the cross-examination of Officer Roberts by defense counsel regarding the November 4, 1992, affidavit yielded the following relevant testimony regarding the informant's reliability:

> Q.   You state that in the prior 20 months that he had give you 60 occasions of information; is that correct?
> A.   Yeah, at least. That's an estimate. * * *
> * * * *
> Q.   Out of those 60 informations, you made 18 arrests; is that correct?
> A.   Approximately, yes.
> Q.   How many of those 60 arrests – out of the 60 informations, 18 arrests, the other 42 time, was the information unreliable?
> A.   *To my knowledge, none of them were. It just didn't lead to an arrest.*

13 SR 8 (emphasis added).   The cross-examination of Officer Roberts by defense counsel regarding the April 9, 1992, affidavit also yielded the following relevant testimony regarding the informant's reliability:

> Q.   Now, in April you say tat he had given you some informatio on 20 occasions; is that correct?
> A.   Yes.
> Q.   And of those occasions, you had made – at least 16 persons had been arrested; is that correct?
> A.   Correct.
> Q.   So, from April to November, you had only made two more additional arrests with * * * 40 more instances of information.
> A.   Apparently so.
> Q.   And you still felt him to be reliable in November?
> A.   *Not all information that we receive can we act on.*
> * * * *
> Q.   Was any of this information from personal observations or stake-outs that you performed?
> A.   *I do get personal observation stake-outs on most information I get.*
> Q.   Did you do it on these instances?
> A.   On these two, yes.

13 SR 11-12 (emphasis added).   In light of Officer Roberts' suppression hearing testimony, petitioner's argument that the affidavit contained false or reckless statements as to the confidential

39

informant's reliability is absurd. Out of approximately 60 tips, and despite the fact that Officer

Roberts typically obtained confirmation by personally staking-out the suspect or location, none of

the tips was found to be unreliable and 18 actually resulted in arrests.

Nevertheless, petitioner makes much of the fact that 40 of the 60 tips came between April

and November, but resulted in only 2 of the 18 arrests. Petitioner contends this is proof of the

informant's "negligible reliability." Petitioner also points to Officer Roberts failure to keep detailed

notes regarding the informant's prior tips, and his inability to remember the informant incriminating

himself by taking or purchasing narcotics as proof of Officer Robert's "reckless disregard" for the

truth, i.e. that the informant was unreliable. Petitioner's arguments are without merit. Officer

Roberts clearly explained why only a few of the tips received between April and November resulted

in arrests. The absence of notes is irrelevant. And Officer Roberts's lack of personal knowledge

regarding petitioner's illegal drug habit does not make his belief in the informant's reliability

"reckless" in light of the informant's proven track record. Because petitioner cannot show that the

affidavit was based upon the affiant's reckless disregard for the truth, the *Franks* doctrine does not

apply and the warrant based on the affidavit is valid if sufficient on its face.

> **b.** **The affidavits supporting the warrants were sufficiently definite as to**
> **time**.

It is a fundamental principle of search and seizure law that the information given to the

magistrate in the application for a search warrant must be timely. Probable cause must be found to

exist at the time the warrant issues. "[T]he proof must be of facts so closely related to the time of

the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets

this test must be determined by the circumstances of each case." *Sgro v. United States*, 287 U.S. 206,

210-11 (1932). Petitioner argues that this requirement was not met.

The leading case in this circuit dealing with the staleness of search warrant information is

*Bastida v. Henderson*, 487 F.2d 860 (5th Cir.1974). In that case, the Fifth Circuit Court of Appeals

wrote:

> * * *   In general, the basic criterion as to the duration of probable cause is the
> inherent nature of the crime. The Circuits hold that where an affidavit recites a mere
> isolated violation then it is not unreasonable to believe that probable cause quickly
> dwindles with the passage of time. On the other hand, if an affidavit recites activity
> indicating protracted or continuous conduct, time is of less significance, * * *.

*Id.* at 864. The practical effect of this rule has been to allow fairly long periods of time to elapse

between information and search warrant in cases where the evidence clearly shows a longstanding,

ongoing pattern of criminal activity. Staleness is an issue which must be decided on the peculiar

facts of each case, and a mechanical count of days is of little assistance in this determination. *United*

*States v. Hyde*, 574 F.2d 856, 865 (5th Cir. 1978). Where unlawful activity consists of a course of

conduct, there is less ground for a claim of staleness than when it consists of an isolated violation

of the law.  *Id. See also United States v. Craig*, 861 F.2d 818, 820-823 (5th Cir.1988) *United States*

*v. Robins*, 978 F.2d 881, 892 (5th Cir. 1992).  As in other issues regarding the existence or absence

of probable cause, common sense and reasonableness must prevail, and a magistrate's judgment

based upon the facts before him must be given considerable deference in the absence of arbitrariness.

Here, the magistrate could reasonably have concluded that the cocaine which was being

"secreted" on the premises "for purpose of sale" would still be present at the time the warrant was

issued. *See, e.g., United States v. Evers*, 552 F.2d 1119, 1121-22 (5th Cir. 1977) (affidavit sufficient

although informant saw drugs in car as much as two days prior to issuance of warrant because

41

affidavit suggested car was being used for storage during transport). Thus, there is no substantial

reason under the circumstances of this case to say as a matter of federal constitutional law that the

72-hour day interval defeated the reasonable probability that the cocaine was at the premises

described. Accordingly, petitioner's argument the warrant is invalid because the supporting affidavit

was "vague as to time" is without merit.

        c.      **The search warrant sufficiently described the property to be seized and the place to be searched.**

The Fourth Amendment prohibits general warrants which fail to particularly describe the

property to be seized, and allow "general, exploratory rummaging in a persons's belongings."

*Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (quoting *Coolidge v. New Hampshire*, 403 U.S.

443, 467 (1971)). The reason for this requirement was aptly stated in *Marron v. United States*, 275

U.S. 192, 196 (1927):

> "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

A warrant which describes the thing to be seized simply as "narcotics" is sufficiently particular.

*Steele v. United States*, 267 U.S. 498, 504 (1925). "Cocaine" is even more specific than "narcotics"

as cocaine is a specific type of narcotic. Moreover, it is well settled that the permissible intensity

of the search within the described premises is determined by the description of the things to be

seized. As the Supreme Court has stated, "the same meticulous investigation which would be

appropriate in a search for two small canceled checks could not be considered reasonable where

agents are seeking a stolen automobile or an illegal still." *Harris v. United States*, 331 U.S. 145

(1947). Thus, where, as here, the warrant authorizes a search for "cocaine" which is "secreted" in

a particular apartment, police have authority to search all places therein where cocaine might be hidden. Accordingly, petitioner's argument the warrant at issue amounted to an impermissible "general warrant" is without merit.

> **d. The warrant sufficiently described the building to be searched such that the discrepancy in house number did not render the warrant invalid.**

Finally, petitioner claims the warrant is invalid owing to an alleged discrepancy between the house number in the affidavits and the warrants ("2190") and the house number of the house which Officer Roberts testified he searched ("2192"). Petitioner did not draw the trial court's attention to the alleged discrepancy at the pre-trial hearing on his motion to suppress (*see* 13 SR 17-18) or at trial. Neither did he raise it on direct appeal. Accordingly, Wilson has not exhausted his state court remedies as required by 28 U.S.C. § 2254(b) with regard to this claim. However, the Director believes it would be futile for Wilson to apply for a second state writ of habeas corpus. A 1995 amendment to the Texas habeas statute prohibits a Texas court from considering the merits of, or granting habeas relief based on, a subsequent writ application filed after the final disposition of the inmate's first application unless he demonstrates the statutory equivalent of either cause or actual innocence. TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5 (West Supp. 1995). Thus, if Wilson were to raise his unexhausted claim in a second state writ application, they would be dismissed as an abuse of the state writ. For this reason, the claims are likewise barred in federal habeas review under the doctrine of procedural default. *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997). If this court should decide any of the unexhausted claims merit federal habeas relief, this cause should properly be dismissed in order to allow the state courts the first opportunity to correct any error.

Even assuming, *arguendo*, the issue is not barred, it is without merit. The Fourth Amendment provides that no warrants shall issue except those "particularly describing the place to be searched." Absolute perfection in description is not required; it "is enough if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925). Where a facially-sufficient description is determined to be less precise than was assumed because the identifying numbers do not match perfectly, officers may be permitted to resolve the matter by making common sense judgments as to which of the several descriptive facts was most likely mistaken.

In this case, the affidavit included a detailed description of the appearance and physical location of the building and specific apartment to be searched in addition to the street number posted on the corner of the building. Here, the discrepancy is easily explained by the characteristics of the building. The description of the premises contained in the affidavit states that the corner of the building bore the number 2190, but also indicates the individual apartment entrances were at street level and petitioner's apartment was the second from the end. Given these facts, the alleged discrepancy disappears: The officer identified the *building* by the first street number on the end, i.e. "2190," but identified the specific *apartment* by location, i.e. "second from the end." That apartment, having its entrance at street level, would also have a different number, i.e. "2192," which may not have been posted outside. Because the premises to be searched were sufficiently described so as to avoid any mistake or confusion and because the alleged discrepancy evaporates in light of that description, petitioner's argument is without merit.

44

4.  **Petitioner cannot show prejudice because the evidence seized pursuant to the November 9, 1992, search warrant was not material to his guilt of the capital murder charge and because the evidence was cumulative and therefore harmless.**

Even if this court finds that petitioner is not barred from raising this claim on federal habeas, the court is not foreclosed from considering the matter under the AEDPA, and that the search warrants were invalid, petitioner's claim nevertheless fails because the evidence seized and submitted to the jury was not material to his guilt or innocence of the murder charge. Moreover, even assuming the drugs and drug paraphernalia were material to petitioner's guilt or innocence of the murder charge, introduction of such evidence was cumulative and therefore harmless.

The State's theory of the case was that when petitioner learned the victim had "snitched," petitioner retaliated by kidnapping and murdering him. Thus, it was the existence of the affidavits supporting the warrants and the occurrence of the searches resulting in petitioner's drug arrest which supported the State's theory of the case, not the seized drugs themselves. Those documents would have been relevant and admissible regardless of their validity to support a legal search as they were not offered for the truth of the matter asserted, *i.e.* that petitioner had secreted cocaine in his apartment, but to establish petitioner's motive to murder the victim, *i.e.* that the victim had "snitched" on the petitioner to police resulting in petitioner's arrest on drug charges. To the extent, if any, the drugs were relevant to the State's case, they were merely cumulative of other evidence of motive. Accordingly, petitioner has not, and cannot, show that introduction of the drugs into evidence contributed to his conviction.

Because petitioner has failed to demonstrate that the subject search warrants were invalid or that any evidence material to his guilt of the capital murder charge was seized at either of the two searches or contributed to his conviction, relief on this claim should be denied.

E.    **Defense counsel provided Wilson with effective assistance of counsel in compliance with Sixth Amendment of the United States Constitution. (Ground Five)**

In his fifth ground for relief, petitioner asserts that defense counsel deprived him of effective assistance of trial counsel in violation of the Sixth Amendment by failing to gather probable cause affidavits that were a matter of public record, improperly pressuring a material witness to change his story, performing an in-court comparison of the physical attributes of Wilson and a witness, and failing to request a charge on the lesser included offense of murder. Petition at 38. Petitioner's claims are barred by state procedural default and otherwise foreclosed by the AEDPA. Moreover, petitioner has failed to demonstrate that trial counsel's alleged errors were anything less than trial strategy, that this strategy was unreasonable, or that prejudice resulted from any alleged errors.

1.    **Petitioner has procedurally defaulted his claims.**

On state habeas, the court found that petitioner "has failed to allege and prove any facts or cite any authorities to support his wholly conclusory allegations that various alleged deficiencies in trial counsel's representation constituted 'ineffective assistance' under *Strickland v. Washington*." Accordingly, the state habeas court concluded that petitioner "has entirely failed to plead a prove a claim which would entitle him to relief" such that the claim was not entitled to any consideration. *Ex parte Wilson*, No. 46,928-01 (Tex. Crim. App. 2000) (adopting the trial judge's findings and conclusions at 1 SHTr 30, 46 ¶ 1). *See* Petitioner's Appendix Vol. 2. Because petitioner procedurally defaulted his ineffective assistance of trial counsel claim in state court, federal review

46

of the claim is procedurally barred. *Harris v. Reed*, 489 U.S. 255, 265, 109 S. Ct. 1038, 1043

(1989); *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 2553 (1991); *Amos v. Scott*, 61

F.3d 333, 338 (5th Cir. 1995).

### 2.   Petitioner's claim is foreclosed by the AEDPA.

In addition, petitioner's claim is foreclosed by the AEDPA. A denial of relief on the merits

by the Texas Court of Criminal Appeals is entitled to deference under the AEDPA. *Davis v.*

*Johnson*, 158 F.3d 806, 812 (5th Cir. 1998). An ineffective assistance of counsel claim involves

mixed questions of law and fact. Thus, under the AEDPA deference scheme, "A federal court will

not disturb a state court's application of law to facts unless the state court's conclusions involved

an 'unreasonable application' of clearly established federal law as determined by the Supreme

Court." *Davis*, 158 F.3d at 812.

As an alternative to default, the state habeas stated:

* * * This court finds and concludes that the facts and explanations asserted in the
affidavits of [petitioner's trial counsel] are true and that those facts, together with
those alleged in the State's Answer herein and with the contents of the official court
records as well as the Court's personal observations and recollection of their
thoroughly competent performance before this Court in the trial of this case,
demonstrate that the totality of the representation afforded applicant by said attorneys
was amply sufficient to protect his right to reasonably effective assistance of counsel
during all phases of the trial herein. The representation and overall performance
afforded [petitioner] by said attorneys as reflect in their affidavits and in the record
of the trial of this case more than satisfied the standards laid down in *Strickland* as
applied by the Texas Court of Criminal Appeals in such cases as *Jackson v. State*,
973 .W.2d 954 (Tex. Crim. App. 1998); *Kober v. State*, 988 S.W.2d 230 (Tex. Crim.
App. 1999); and *Mitchell v. State*, 989 S.W.2d 747 (Tex. Crim. App. 1999).

*Ex parte Wilson*, No. 46,928-01 (Tex. Crim. App. 2000) (adopting the trial judge's findings and

conclusions at 1 SHTr 30, 46-47 ¶2). *See* Petitioner's Appendix Vol. 2. In his federal habeas

petition, Wilson again merely regurgitates, word-for-word, the argument already rejected by the state

47

habeas court. *Compare* Petition at 38-40 *with* State Habeas Petition at 36-38. Because petitioner failed to demonstrate that the state court's adjudication was either contrary to, or involved an objectively unreasonable application of, clearly established federal law as determined by the Supreme Court, federal habeas corpus relief should be denied.

### 3. Petitioner's claim fails on the merits.

Petitioner's procedural default and the AEDPA aside, his ineffective assistance of trial counsel claims fail on the merits. The Sixth Amendment guarantees a defendant a right to effective assistance of counsel at trial. *Strickland v. Washington*, 466 U.S. 668, 684-86, 104 S. Ct 2052, 2063 (1984). Claims of ineffective assistance of counsel are to be reviewed under the two-pronged standard of *Strickland v. Washington. See Burger v. Kemp*, 483 U.S. 776, 102 S. Ct. 3114 (1984). Under the *Strickland* standard, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S. Ct at 2064. A claim of ineffective assistance may be disposed of for want of either deficient performance or actual prejudice; if the absence of one element is dispositive of the claim, further inquiry is unnecessary. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 1069-70. *See also*, *Lincecum v. Collins*, 958 F.2d 1271, 1278 (5th Cir. 1992).

To demonstrate deficient performance, petitioner must show that counsel's conduct falls beyond the bounds of prevailing, objective professional standards. *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064-65; *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S. Ct. 1495, 1511 (2000). In reviewing these claims, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Further, there is a presumption that counsel has rendered adequate

48

assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690, 104 S. Ct. at 2066.

Even if counsel's representation was deficient, a petitioner must also affirmatively prove prejudice by demonstrating that as a result of counsel's errors his trial was rendered fundamentally unfair or unreliable. To demonstrate that his trial was unreliable as a result of errors of counsel, a petitioner must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2068-69; *Williams*, 529 U.S. at 391, 120 S. Ct. at 1512. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.*

Initially it must be noted that petitioner provides no legal analysis or citation to relevant authority in support of his claims that defense counsel violated his right to effective assistance of counsel under the Sixth Amendment by failing to gather probable cause affidavits that were a matter of public record, improperly pressuring a material witness to change his story, and by performing an in-court comparison of the physical attributes of Wilson and a witness. Although the argument portion of this section of petitioner's brief incorporates by reference the analysis contained in earlier sections of his brief regarding the propriety of a parole eligibility jury instruction (claim one), the constitutionality of Texas' murder in the course of a kidnapping statute (claim two), the petitioner's *Batson* claims (claim three), and the validity of two search warrants (claim four), those sections and the analysis contained therein simply have nothing to do with the ineffective assistance of counsel claims raised here. Accordingly, petitioner has failed to establish that four of his ineffective assistance of trial counsel claims satisfy either prong of the *Strickland* test.

49

Although petitioner provides limited analysis of his one remaining ineffective assistance of

trial counsel claim, *i.e.* that defense counsel violated his right to effective assistance of counsel under

the Sixth Amendment by failing to request a jury instruction on the lesser included offense of

murder, this claim is simply without merit.

To determine whether a charge on a lesser-included offense should be given, Texas has

implemented a two-step test. *See Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App.1985);

*Royster v. State*, 622 S.W.2d 442, 444 (Tex. Crim. App.1981) (plurality opinion). The first step is

to decide whether the offense is actually a lesser-included offense of the offense charged.[13] *See* Art.

37.09; *see also, e.g., Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App.), *cert. denied*, 510

U.S. 919 (1993); *Aguilar*, 682 S.W.2d at 558. Murder is a lesser- included offense of capital murder.

*See Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000); *Moore v. State*, 969 S.W.2d 4,

12 (Tex. Crim. App. 1998). Hence, the first prong of the test is satisfied.

The second step of the *Aguilar/Rousseau* test requires that the record contain some evidence

that would permit a rational jury to find that the defendant is guilty only of the lesser offense. *Moore*,

969 S.W.2d at 8; *Rousseau*, 855 S.W.2d at 672. In other words, there must be some evidence from

which a rational jury could acquit the defendant of the greater offense while convicting him of the

---

[13]     Article 37.09 defines a lesser-included offense:
        An offense is a lesser included offense if:
            (1) it is established by proof of the same or less than all the facts required to establish
the commission of the offense charged;
            (2) it differs from the offense charged only in the respect that a less serious injury or
risk of injury to the same person, property, or public interest suffices to establish its commission;
            (3) it differs from the offense charged only in the respect that a less culpable mental
state suffices to establish its commission; or
            (4) it consists of an attempt to commit the offense charged or an otherwise included
offense.

lesser-included offense. *Moore*, 969 S.W.2d at 8. The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense. *Wesbrook v. State*, 29 S.W.3d 103, 113-14 (Tex. Crim. App.2000), *cert. denied*, --- U.S. ----, 121 S.Ct. 1407.[14]

The evidence in the instant case showed that petitioner accosted the victim in the parking lot of a grocery store, started beating him and threatened his life. The victim attempted to flee, but was pursued by the petitioner, recaptured and forced at gunpoint into the back seat of a car which then drove away. The victim's naked body was found the following morning some distance away from the grocery store parking lot.

For the reasons discussed more fully in section III.B.2, *supra*, the facts regarding the victim's abduction satisfy all the elements for kidnapping, but do not support petitioner's contention that the kidnapping was merely incident to the victim's murder. Thus, the lesser-included offense of murder was not a valid, rational alternative to the offense of murder committed in the course of a kidnapping. Hence, the second prong of the *Aguilar/Rousseau* test is not met. Where, as here, petitioner is not entitled to a lesser included offense instruction under the *Aguilar/Rousseau* test, trial counsel is not ineffective for recognizing that fact and not requesting one.[15]

---

[14]    In *Arevalo v. State*, 943 S.W.2d 887, 889 (Tex. Crim. App.1997), the Court of Criminal Appeals explained why the evidence raising a lesser-included must provide a viable and rational alternative to the greater offense:

> The second prong of the test preserves the integrity of the jury as the factfinder by ensuring that the jury is instructed as to a lesser included offense only when that offense constitutes a valid, rational alternative to the charged offense. If a jury were instructed on a lesser included offense even though the evidence did not raise it, then the instruction "would constitute an invitation to the jury to return a compromise or otherwise unwarranted verdict."

[15]    At the conclusion of the evidence phase, petitioner's trial counsel did not feel that the evidence warranted a request for the lesser included charge of murder. Makin Affidavit 1 SHTr 24; Burbank Affidavit 1 SHTr 26 (both reproduced in Petitioner's Appendix Vol. 2, Exh. 8).

However, even assuming petitioner was entitled to a lesser included offense instruction under the *Aguilar/Rousseau* test, petitioner has not proved—and cannot prove—that defense counsel's failure to request such an instruction was anything but trial strategy.    The failure to request an instruction on a lesser included offense to which the defendant was entitled, might have been the result of an all-or-nothing trial strategy.  *Wood v. State*, 4 S.W.3d 85, 87-88 (Tex. Crim. App. 1999, pet. ref'd).    Because such a trial strategy, although risky, is sometimes successful, appellate courts rarely say the strategy was so unreasonable as to deny appellant the effective assistance of counsel. *Lynn v. State*, 860 S.W.2d 599, 603 (Tex. Crim. App. 1993, pet. ref'd).    Here, petitioner fails to satisfy his burden of rebutting the presumption that the failure to seek such an instruction was not sound trial strategy.

Because petitioner has failed to demonstrate a valid claim under the principles of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), relief on his ineffective assistance of trial counsel claims should be denied.

> **F.    Appellate counsel was not required to raise futile issues in order to provide Wilson with effective assistance of appellate counsel under the Sixth Amendment.**

Finally, petitioner claims he received ineffective assistance of appellate counsel in violation of the Sixth Amendment because appellate counsel did not adequately brief other issues which, petitioner argues,  raise concerns regarding the constitutionality of: the omission of a parole instruction, the Texas capital murder statute, the admissibility of evidence seized pursuant to an allegedly invalid search warrant, the State's alleged *Batson* violations, and trial counsel's performance at the guilt/punishment phase of his trial.  Petitioner's claims are foreclosed by the AEDPA and otherwise without merit.

On state habeas, the court addressed this claim and concluded that petitioner's allegations were "entirely conclusory" and "clearly without merit." *Ex parte Wilson*, No. 46,928-01 (Tex. Crim. App. October 11, 2000) *(per curiam)* (unpublished order) (adopting the trial judge's findings and conclusions at 1 SHTr 48-49). *See* Petitioner's Appendix Vol. 2. Nothing in petitioner's federal habeas petition establishes that the state habeas court's adjudication was either contrary to, or involved an objectively unreasonable application of, clearly established federal law as established by the Supreme Court. Moreover, because as discussed more fully *supra*, petitioner's various claims of constitutional error all lack merit, his claims of ineffective assistance of appellate counsel resulting from a failure to raise those issues on direct appeal are equally without merit. Because the state habeas court's determination is entitled to deference and because petitioner's claims lack merit, petitioner is not entitled to federal habeas relief.

## IV. Conclusion

As established *supra,* Wilson's unexhausted procedurally defaulted claims, even if considered, fail on the merits. Further, Wilson has failed to demonstrate that the state courts' adjudication of any of his remaining claims resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law. Nor has Wilson proven that the state courts made an unreasonable determination of the facts in light of the evidence presented below with regard to any of the claims raised in the instant federal habeas petition. As such, Wilson's petition for federal writ of habeas corpus does not entitle him to relief and should be denied. Further, Wilson has not made a substantial showing of the denial of a federal constitutional right concerning any of his claims. As a result, this court should also deny Wilson a certificate of appealability on all of the issues raised in the instant proceeding.

WHEREFORE, PREMISES CONSIDERED, the Director respectfully requests that his motion for summary judgment be granted, that Wilsons' federal petition for writ of habeas corpus be summarily denied with prejudice, and that no certificate of appealability issue with regard to any of the claims raised in the instant federal habeas petition.

Respectfully submitted,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

MICHAEL T. MCCAUL
Deputy Attorney General
for Criminal Justice

GENA BUNN
Chief, Capital Litigation Division
Assistant Attorney General

\* Counsel of Record

\*MARGARET SCHMUCKER
Assistant Attorney General
Capital Litigation Division
State Bar No. 24030874
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1600
(512) 320-8132 (Fax)

ATTORNEYS FOR RESPONDENT

54

## CERTIFICATE OF SERVICE

I, Margaret Schmucker, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Respondent Cockrell's Original Answer and Motion for Summary Judgment with Brief in Support** has been served by placing same in the United States Mail, postage prepaid, on this the 8th day of February, 2002, addressed to:

James A. DeLee
2300 Memorial
Port Arthur, TX 77640
ph (409) 983-3234

MARGARET SCHMUCKER
Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| *MARVIN LEE WILSON,* | § | |
| Petitioner, | § | |
| | § | |
| *v.* | § | CIVIL ACTION NO. 6:01 CV 186 |
| | § | |
| *JANIE COCKELL, DIRECTOR,* | § | |
| *TEXAS DEPARTMENT OF* | § | |
| *CRIMINAL JUSTICE,* | § | |
| *INSTITUTIONAL DIVISION,* | § | |
| Respondent. | § | |

**O R D E R**

CAME ON this day for consideration **Respondent Cockrell's Motion for Summary Judgment,** and the Court having considered said Motion is of the opinion that it has merit and should be GRANTED.

It is hereby ORDERED, ADJUDGED and DECREED that the petition for writ of habeas corpus is denied with prejudice.

SIGNED on this the _____ day of _____, _____.

_____
JUDGE PRESIDING

# APPENDIX  A

# CRIME IN TEXAS

# 2000

## TEXAS DEPARTMENT OF PUBLIC SAFETY

Thomas A. Davis, Jr.
**Director**

David McEathron
Frankie Waller
**Assistant Directors**

**Public Safety Commission**
M. Colleen McHugh
**Chairman**

Robert B. Holt
James B. Francis, Jr.
**Commissioners**

**Administrative Division**
Burton Christian
Division Chief

**Crime Records Service**

David Gavin
**Assistant Chief, Administration
Crime Records Service**

Valerie Fulmer
**Deputy Administrator**

Beverly E. Reeves
**Manager, Crime Information Bureau**

Rosemary Webb
**Program Administrator, UCR**

For Additional Information call 512/424-2091 or
e-mail: ucr@txdps.state.tx.us

# INDEX CRIME ANALYSIS

3

# MURDER

## DEFINITION

Murder and nonnegligent manslaughter, as defined in the UCR program, is the willful killing of one human being by another.

This offense category includes any death resulting from a fight, argument, quarrel, assault or commission of a crime. Attempted murder and assaults with the intent to kill are not counted as murder, but are included in UCR as aggravated assaults. Suicides, accidental deaths, and justifiable homicides are also excluded from the murder classification.

The classification of this offense, as well as for all Index Crimes, is based solely on police investigation and not upon determinations by courts, medical examiners, coroners, juries, or other judicial bodies.

## ANALYSIS

### Volume

The reported number of murders committed in Texas in 2000 was 1,236. This represented a 1.5 percent increase in the number of murders when compared to 1999. More persons were murdered in Texas in October than in any other month, while the fewest were killed during February. Property loss during the commission of the crime of murder amounted to $351,303.

### Rate

The murder rate for Texas in 2000 was 5.9 murders for every 100,000 persons, down 3.3 percent from 1999.

### Clearance Rate

Texas law enforcement agencies continue to be successful in solving a greater percentage of murders than any other Index Crime. In 2000, 69 percent of all murders were cleared by arrest or exceptional means.



Murder by Month Totals – 2000



Murder Offenses 1986 – 2000

### Nature

Of the 1,236 murders in 2000, 62 percent were committed by the use of firearms. Knives or cutting instruments were the weapons of choice in 14 percent of the reported cases. The use of strongarm weapons (hands, feet and fists) accounted for 7 percent of the murders. Blunt objects were

employed in 8 percent of the murders and in the remaining 9 percent, the murder weapon of choice was listed as unknown or other, which includes poison, fire, drugs, drowning, strangulation and asphyxiation.

Of the murders in which firearms were the instrument, handguns accounted for 72 percent of the weapons (or 46 percent of all murders). Shotguns were the murder means in 8 percent of the firearm murders, rifles were used in 6 percent and firearms whose type was not stated accounted for the remaining 14 percent.



age 16 and under, 68 percent were White; 31 percent were Black; 62 percent were not Hispanic; and 38 percent were Hispanic.





## Justifiable Homicide

Statistics on murder circumstances, victims, and victim/offender relationships on these pages include justifiable homicides. Justifiable homicide is the intentional killing of a person without evil design and under such circumstances of necessity or duty as to render the act proper. In 2000, there were 45 justifiable homicides, of which, 18 were felons killed by private citizens, and 27 were felons killed by police.

## Murder Circumstances

Supplementary homicide information on murder circumstances is collected in two broad categories: felony type and non-felony type. While, in Texas, all murders are felonies, felony type circumstances refer to murders which occur in conjunction with the commission of another crime.

## Persons Arrested

When compared to 1999 statistics, the number of persons arrested for the crime of murder in Texas decreased 6.9 percent. Of the persons arrested for murder, 91 percent were male; 6 percent were

## Murder Circumstances

| Circumstance Type | Group % | Circumstance | Number |
|---|---|---|---|
| Felony Type | 19% | Rape | 6 |
| | | Robbery | 131 |
| | | Burglary | 9 |
| | | Larceny | 3 |
| | | Arson | 4 |
| | | Motor Vehicle Theft | 1 |
| | | Other Sex Offenses | 0 |
| | | Gambling | 4 |
| | | Other Felony Type | 76 |
| Non Felony Type | 50% | Lover's Triangle | 9 |
| | | Child Killed by Baby Sitter | 3 |
| | | Brawl Due to Influence of Alcohol | 39 |
| | | Brawl Due to Influence of Narcotics | 51 |
| | | Argument Over Money or Property | 34 |
| | | Other Arguments | 357 |
| | | Juvenile Gang Killings | 4 |
| | | Gangland Killings | 0 |
| | | Institutional Killings | 1 |
| | | Other Circumstances | 120 |
| Unknown | 31% | Unknown Circumstances | 384 |

## MURDER VICTIMS

Law enforcement agencies participating in UCR provide additional homicide information so that an in-depth analysis of murder is possible. Through the Supplemental Homicide Reporting system, information is provided that identifies the age, sex, race and ethnic origin of both victims and offenders; the relationship of the victim to the offender; the murder weapon; and the circumstances of the offense.

Based on the information relating to murder victims it can be determined that 75 percent of murder victims, in 2000, were male and 25 percent were female. The age group with the greatest number of murder victims for both males and females is the 20 to 24 age group.

Of the victims whose race was known, 71 percent were White, 27 percent were Black, and the remainder were Asian/Pacific Islander and American Indian/Alaskan natives. For White victims, the most common age group was the 25 to 29 age bracket. For Black victims it was the 20-24 age group. Of the murder victims whose ethnicity was known, 59 percent were not Hispanic and 41 percent were Hispanic.

## Relationship of Victim to Offender

| Relationship Type | Group % | Victim's Relationship | Number |
|---|---|---|---|
| Family | 15% | Husband | 14 |
| | | Wife | 50 |
| | | Common-Law Husband | 3 |
| | | Common-Law Wife | 22 |
| | | Mother | 7 |
| | | Father | 10 |
| | | Son | 10 |
| | | Daughter | 16 |
| | | Brother | 10 |
| | | Sister | 1 |
| | | In-Law | 8 |
| | | Stepfather | 1 |
| | | Stepmother | 0 |
| | | Stepson | 6 |
| | | Stepdaughter | 6 |
| | | Other Family | 16 |
| Not Family, but Known to Victim | 31% | Neighbor | 15 |
| | | Acquaintance | 238 |
| | | Boyfriend | 8 |
| | | Girlfriend | 24 |
| | | Ex-Husband | 2 |
| | | Ex-Wife | 8 |
| | | Employee | 2 |
| | | Employer | 1 |
| | | Friend | 24 |
| | | Homosexual Relationship | 1 |
| | | Other-Known to Victim | 69 |
| Other | 54% | Stranger | 188 |
| | | Unknown Relationship | 521 |





